**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
HATTIESBURG DIVISION**

**BENNY JOE STEVENS**                                        **PETITIONER**

**VS.**                                        **CIVIL ACTION NO. 2:04CV118KS**

**CHRISTOPHER B. EPPS, LAWRENCE
KELLY and JIM HOOD**                                        **RESPONDENTS**

---

## MEMORANDUM OPINION AND ORDER

Benny Joe Stevens was convicted of four counts of capital murder while in the course of a felonious child abuse and a burglary, as well as a charge of aggravated assault, in the Circuit Court of Marion County on December 3, 1999.  He was sentenced to twenty years on the aggravated assault charge and to death on the capital murder charges.   Stevens appealed the convictions and sentences to the Mississippi Supreme Court, raising thirteen assignments of error, all of which were rejected. *Stevens v. State*, 806 So. 2d 1031 (Miss. 2001).  In his petition for post-conviction relief, Stevens raised twelve issues, and the court found that they all lacked merit.  *Stevens v. State*, 867 So. 2d 219 (Miss. 2003).  Stevens filed his Petition for Writ of Habeas Corpus in this Court on October 18, 2004.  The Court has carefully reviewed the grounds for relief urged by Stevens, as well as the state court record, and, for the reasons explained below, holds that none of them entitle Stevens to habeas relief.

**I.**                                        **STATEMENT OF FACTS**

Benny Stevens was convicted of four counts of capital murder for the October 18, 1998, killings of Wesley Reed, Glenda Reed, Dylan Lee and Heath Pounds.  Glenda Reed was Benny's ex-

wife, and they had two daughters – Angela and Erica.  For several years prior to the murders, Benny and Glenda had fought over child custody and  support issues.  Custody of the children had changed at one point from Glenda to Benny, but had recently been given back to Glenda.  Wesley Reed was Glenda's husband, and Dylan Lee was her eleven-year-old child.  The record suggests at different points that Dylan might have been Benny's child, as well.  Twelve-year-old Heath Pounds was a neighborhood friend of Dylan's.  At the time of the murders, Benny was married to Lauren Stevens.

October 18 was a Sunday, and Benny's brother, Ricky Stevens, arrived early that morning at Benny and Lauren's trailer outside Foxworth, Mississippi.  The brothers planned to drink beer and watch football.  At some point, Benny and Ricky left in Benny's truck to go to a pool hall.  On the way home, Benny drove his truck into a ditch.  According to Ricky, the impact of the accident caused Benny to hit his head on the windshield of the truck.  There was evidence that Benny also cut his elbow in the accident.

Benny called his wife to help them after the accident, and Lauren Stevens testified at trial that Benny seemed drunk and disoriented when she arrived at the scene.  The truck was on its side, and it was difficult to get Benny out of it.  After they got the truck out of the ditch, Benny, Ricky, Lauren and Cheyenne (Ricky's young daughter, who had been left with Lauren) went back to Benny's trailer.  Benny and Ricky went to sleep in different parts of the trailer, but they woke later in the day to eat.  Eventually, Benny went back to the master bedroom to sleep, and Ricky fell asleep on the front porch.

At some point, Lauren heard movement in their bedroom, and she went in to check on Benny.  He had his "gun belt" laid out on the bed, and he was putting shotgun shells in it, which he told her were only filled with bird shot.  Lauren went back out to living room with Cheyenne, and, a short

time later, Benny came out of the bedroom with his .357 handgun, his shotgun, and the gun belt. Lauren was immediately alarmed and tried to prevent Benny from leaving the trailer. Her concern was that Benny would go to Glenda's house and "do something really bad," because he had made statements to that effect before.

While Lauren was standing in front of him, crying and asking him not to do anything, Benny looked down at his .357 and back at Lauren and said, "This gun is loaded." Then he seemed to freeze, and Lauren became aware that there was a visitor on the porch, Julie Hollinger. Benny returned to the bedroom and put away his weapons, then went out to speak to Julie and his brother. Lauren returned to the living room to care for Cheyenne, and Benny returned to the bedroom.

As soon as Julie left, however, Lauren testified that Benny "shot" out of the trailer. Lauren followed him out to the porch and told Ricky that Benny was "messing up really bad ." She asked Ricky to stop him, but Benny left in his truck. According to Lauren, she considered calling 911, but decided that this was just another instance where Benny was going to ride around with his guns, as he had done before without incident.

After Benny left his home, he went to the trailer where Glenda lived, which was just a few miles away. Glenda, Wesley, Dylan, Heath and Erica were all at the trailer, having just finished Sunday dinner. Erica survived the attack, and she testified at trial to the events that followed. When Benny arrived, Erica was washing dishes, Glenda was watching television in her bedroom, and Dylan and Heath were playing Nintendo in the living room. Erica's sister, Angela, had gone to church with her boyfriend. Erica saw Benny drive up and park behind the trailer, and she told Wesley that he was there. Wesley went to the sliding glass door at the back of the trailer and said,

"Benny Joe, can I help you?"  Then, Erica heard a gunshot, and Wesley said, "Shit, he shot me."  She turned and saw that Wesley had fallen to the floor, shot in the arm.

Erica left the kitchen and tried to get the boys up and shepherd them to her mother's bedroom.  As she got to the door, she was shot in the back and fell through to her mother's room.  She testified that she could hear Dylan and Heath screaming.  Erica told her mother that Benny had shot her and Wesley, and Glenda told Erica to hide.  Erica went into the bathroom and hid in the shower, but she testified that she could see into the bedroom from there.  She saw that Glenda had grabbed her gun and heard her tell Benny that he couldn't have her babies.  She heard her father tell her mother, "Bitch, I told you that I'd kill you one of these days."  Then she testified that she heard another gunshot and saw Glenda "jerk."

Erica came out of the shower and saw Benny leaving the bedroom, with a "John Wayne" belt on.  She could hear Wesley screaming out everyone's name, asking someone to call 911, and asking God to help him.  Erica managed to squeeze out of a small window in the bathroom and hid under the trailer.  She heard more gunshots and decided that she had to get away.  A red truck came by the trailer at that time, and she chased it, seeking help.  Erica testified that she heard more shots as she was running.  The truck did not stop, so Erica ran down the road to a neighbor's house.  The neighbor took her in and called 911.

Deputies from the Marion County Sheriff's Department answered the call, and, when they arrived at the trailer, they found all four victims already dead.  Wesley was on the kitchen floor, Dylan was on the living room floor, and Heath and Glenda were in the bedroom.  Wesley had been shot four times – twice with a shotgun and twice with a handgun.  The first shot was a non-lethal distant shotgun wound of the front right shoulder.  The second was a lethal shotgun wound to the

4

left side of the face, fired from a distance of two and one-half to three feet.  Another lethal wound was made by a handgun, at a near distance, to the upper part of the back, which traveled to the stomach.  Finally, there was another near contact gunshot wound to the head, which traveled to the chest.  The bullets from the third and fourth wounds were recovered from Wesley's body.

Dylan Lee's body was found in the doorway between the living room and the master bedroom.  According to the officer who discovered his body, the top of his head had been blown off.  An autopsy indicated that he died from a single shotgun wound to the back of his head.  Glenda also died from a single shotgun wound to the back of the head, fired from a distance of four to five feet.  Her body was found in a kneeling position between the bed and a dresser.  Heath Pounds's body was also in the bedroom, on the other side of the bed.  He had been shot twice – the first was a non-lethal distant shotgun wound to the face.  The second shotgun wound occurred at a closer distance, and the position of the body and the wounds indicated that he was in a defensive posture, with his arm raised.  That wound was lethal, with shot traveling through his right lung, heart and aorta and severing his spine.

Deputies found a bloody footprint on the rear patio steps, which was removed and used as evidence.  They also found twelve-gauge shotgun shells and wadding in the house, as well as a shell on the back steps.  Police were at the neighbor's house when Erica was loaded into an ambulance, and she told them that her father had shot her.

Lauren Stevens testified that Benny returned to their trailer sometime later, while she was still on the front porch with Ricky.  She asked what he had done, and he said, "I just killed a family."  Ricky left with his daughter, and Lauren prepared to leave, as well.  As she was getting into her car, Benny handed her a gun that she later discovered was Glenda's and said, "This is what they tried to

5

kill me with." Lauren took the gun and drove to her brother's house in Columbia. From there, she called Jim Rhoden, the lawyer who represented Benny in his divorce proceedings. She talked to Jim, who suggested that she talk to Morris Sweatt, who was a criminal lawyer and ultimately represented Benny at trial. Rhoden advised her to have Benny come to his office. While she was talking to him, Benny arrived at her brother's house.

Lauren went out to talk with Benny, and he had his .357 with him. According to Lauren, he asked her, "What can I do with this? This is hot." She told him to go to Rhoden's office and turn himself in, and he left. He returned shortly thereafter, because Rhoden was not in his office. Lauren advised him to go back to Rhoden's office, but, before he could leave, the police arrived, with Rhoden. Lauren went out to Benny's truck and told him to leave his gun in it and let Rhoden help him turn himself in. Benny cooperated with Rhoden and with the police, who arrested him.

A short time after this occurred, Lauren decided to sell some trees on her property, which was where their trailer was located. On a visit to Benny at the jail, she told him of her plan, and he said, "You're going to hang me." He told her that he had hidden a gun in the trees on the property. Lauren located the tree and the gun and informed the police, who removed it. The gun was a Winchester twelve-gauge shotgun, with a shell in the chamber and one in the magazine.

When Benny was arrested, he had a switchblade knife and eight .45 caliber unspent cartridges in his pockets. Police also seized the tennis shoes that he was wearing. A later search of Benny's truck produced a .357 magnum Smith and Wesson with seven shells inside, two spent twelve-gauge shotgun shells, and an ammunition belt. Another .357 was found under the seat of his truck, as well as a .22 magnum derringer. After he had been in a jail for a few days, Benny told a police officer

6

that he had hidden a loaded .45 caliber handgun and three clips of ammunition in an alleyway behind an office building in Columbia, which was also recovered.

Expert evidence at trial showed that the shotgun shells found at the Reed's trailer and in Benny's truck were fired from the shotgun found in a tree on Lauren Stevens's property. That shotgun would hold up to five rounds. (Seven rounds were shot from that shotgun at the victims.) There was also expert testimony that established that the bullets removed from Wesley Reed's body were fired from one of the .357 handguns found in Benny's truck. Finally, the bloody footprint found on the back steps of the trailer were positively matched to Benny's tennis shoes.

Benny was indicted on four counts of capital murder, with the underlying felonies of burglary and child abuse, as well as a fifth count of aggravated assault. A motion to sever these counts for trial was denied. Venue was moved to Madison County, and the trial before Judge Michael Eubanks took place there on November 29, 1999. Benny Stevens was found guilty of four counts of capital murder, and he was sentenced to death on each count. His conviction and sentence were affirmed by the Mississippi Supreme Court on direct appeal and on his petition for post-conviction relief. He raises thirteen grounds to support his Petition for Writ of Habeas Corpus.

## II.                    ANALYSIS OF THE ISSUES

### Standard of Review

The applicable portions of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. 104-32, 110 Stat. 12144, modified 28 U.S.C. § 2254, which now provides:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any

claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim -

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). Under the AEDPA, where the state court adjudicates the petitioner's claim on the merits, this court reviews questions of fact under § 2254(d)(2), while questions of law or mixed questions of law and fact are reviewed under § 2254(d)(1). Factual findings are presumed to be correct, and the court defers to the state court's decision regarding factual determinations unless it "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *Hill v. Johnson*, 210 F.3d 481, 485 (5th Cir. 2000); 28 U.S.C. § 2254(d)(2). The court independently reviews questions of law and mixed questions of law and fact to determine whether the state court's decision thereon was either "contrary to" or an "unreasonable application of" federal law. *Williams v. Taylor*, 529 U.S. 362 (2000); *Williams v. Puckett*, 283 F.3d 272 (5th Cir.2002); *Hill v. Johnson*, 210 F.3d at 485.

For purposes of this analysis, "federal law" is determined by the Supreme Court of the United States, and this Court must determine whether the state court's decision was "contrary to" or "an unreasonable application of" that established federal law. *Williams*, 529 U.S. at 378, 406; § 2254(d)(1). A state court's adjudication of a claim is *contrary to* clearly established federal law if the state court applies a rule different from the governing law set forth in Supreme Court cases or if it decides a case differently than the Supreme Court has on a set of materially indistinguishable

8

facts. *Brown v. Payton*, 544 U.S. 133, 141 (2005). A state court's application of the correct legal precedent to the particular facts of a petitioner's case will be an *unreasonable application* of the law if it identifies the correct federal law but unreasonably applies it to the facts, unreasonably extends the correct legal principle to a new context where it should not apply, or unreasonably refuses to extend the principle to a new context where it should apply. 529 U.S. at 406. The term "unreasonable," was distinguished in *Williams* from "erroneous" or "incorrect;" thus, a state court's incorrect application of the law may be permitted to stand if it is, nonetheless, "reasonable."

**Ground A:**    **The trial court denied Mr. Stevens's Sixth Amendment right to an impartial jury and his Fourteenth Amendment right to due process of law as set forth in the United States Constitution.**

Benny Stevens is white; this contention is based on the prosecutor's striking two black jurors during voir dire – the first was a juror who is only referred to in the record and the briefs as "Ragsdale." (Although the record apparently contains the questionnaires of all the other jurors, his is not included). The second juror was Anita Olive. Defense counsel objected to both strikes; in both cases, the prosecutor offered race-neutral reasons for the challenges. The trial judge permitted the strikes. Ultimately, one black juror, Melvin Bouldin, served on the jury.

In *Batson v. Kentucky*, 476 U.S. 79 (1986), the Court adopted a case-specific, three-part test, by which the defendant could establish that discrimination had occurred in the jury selection in his case. As a preliminary matter, the defendant must show that the prosecutor's use of peremptory challenges raised an inference that the prosecutor was purposefully excluding members of his race from serving on the jury. 476 U.S. at 96. (This holding has since been extended to members of any race. *Powers v. Ohio*, 499 U.S. 400 (1991)). The defendant must show that a discriminatory intent

motivated the strikes; it is not enough to show that the strikes disproportionately impacted jurors of one race. *Hernandez v. New York*, 500 U.S. 352, 359-60 (1991). Establishing a pattern or practice of strikes against black jurors is one means of establishing a prima facie case, but it is not the only way in which it may be established; showing that jurors of different races were questioned differently may also infer a discriminatory motive. *Batson*, 476 U.S. at 97. In fact, one discriminatory act in jury selection may be sufficient to establish a *Batson* violation. *Johnson v. California*, 545 U.S. 162, 169 n.5 (2005).

Once the defendant establishes a prima facie case of discrimination, the prosecutor must come forward with a race-neutral explanation for his challenges. *Batson,* 476 U.S. at 97. Because the burden is always on the defendant to prove discrimination, the prosecutor's explanation need not be persuasive; it must only be based on some factor other than the juror's race. *Hernandez*, 500 U.S. at 360. However, he must do more than simply deny that he had a discriminatory motive. *Batson*, 476 U.S. at 98. If the prosecutor offers an explanation before the trial judge determines that the defendant has established an inference of discrimination, then that showing becomes moot, and the judge should rule on the ultimate issue. *Hernandez*, 500 U.S. at 359. Even if the prosecutor's reasons are frivolous or nonsensical, the analysis does not end, it merely proceeds to the third step. *Johnson*, 545 U.S. at 171; *Purkett v. Elem*, 514 U.S. 765, 769 (1995).

During the third step, the trial court must determine whether the defendant has established purposeful discrimination in the jury selection process. *Batson*, 476 U.S. at 98. At that point, the most persuasive evidence of discriminatory intent can be the demeanor of the attorney challenging the juror, which is best evaluated by the trial judge. *Hernandez*, 500 U.S. at 365. However, the judge may also consider other factors; e.g., the fact that the prosecutor defended his strikes without

being asked to may be viewed as favorable to his explanation for the strikes.  *Id*. at 370.  If the explanation includes reasons that are unacceptable, such as gender, the trial court is still not required to find that the other reasons are pretextual.  *Rice v. Collins*, 546 U.S. 333, 341 (2006).  Similarly, the fact that the trial judge did not see the conduct that is alleged as the reason for the strike does not eliminate that conduct as a race-neutral reason for challenging the juror.  *Id*.

Once the trial court has made its determination with respect to discriminatory intent, that determination is a finding of fact that is entitled to a presumption of correctness.  *Hernandez*, 500 U.S. at 364.  When a *Batson* challenge is considered in the context of habeas review, the federal court cannot reject the state court's determination on the issue unless it was "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  *Rice*, 546 U.S. at 338, quoting 28 U.S.C. § 2254(d)(2).  If the findings are made by a state appellate court, rather than the trial court, they are equally entitled to the presumption of correctness.  *Sumner v. Mata*, 455 U.S. 591, 592-93 (1982);  *Moody v. Quarterman*, 476 F.3d 260, 268 (5th Cir.).  However, a finding of non-discrimination must be based on the actual reason[s] proffered by the prosecutor; neither the trial judge nor a reviewing court may substitute a better reason for the strike.  *Miller-El* v. Dretke, 545 U.S. 231, 252 (2005).

Stevens relies heavily on the opinion in *Miller-El* to support his argument that Ragsdale and Olive were struck for reasons that were racially motivated.  In *Miller-El,* the Court recognized several factors that may be considered in determining discrimination.  There, in light of widely known evidence that the office prosecuting that case had a long-standing policy to exclude black citizens from jury service, the Court found that the prosecution's striking ten of the eleven available black venireman was statistically relevant to the claim of discrimination.  Additionally, the Court

11

considered the fact that the prosecution had made four requests that the jury be "shuffled" after blacks appeared near the front of the venire.  *Id*. at 253.  The Court also found that the prosecution made different inquiries of black and white jurors, and, where the same questions were asked, they were worded differently to jurors of different races.  Reasons offered by the prosecution for the challenges were discounted by the Court, noting that the reasons applied equally to white jurors who were permitted to serve.  Another reason that the prosecutor's explanations for striking black jurors were rejected by the Court was the failure to engage those jurors in meaningful voir dire on the areas of concern.  *Id.* at 246.  Finally, the Court was not persuaded by the prosecution's ultimate acceptance of one black juror, since he was accepted near the end of jury selection, when the State was running out of peremptory challenges, and several remaining members of the venire had expressed opposition to capital punishment.  *Id*. at 249-50.

In Stevens's case, the prosecutor's peremptory challenges were exercised on the second day of voir dire.  During the discussion on jury selection, the prosecutor asked that juror number eighteen, Mr. Ragsdale, be excused for cause.  According to the prosecutor, he had just received Ragsdale's questionnaire, which showed a Jackson address.  The court refused to excuse him for cause, stating, "He could still be a registered voter . . . ."  The prosecutor then argued that Ragsdale "was against the wall, and he was sleeping the whole time, didn't pay attention."  The judge stated, "I didn't notice that."

At that point, defense counsel made a *Batson* claim, but the prosecutor argued that there had to be a "pattern of discrimination" before he had to give a reason for the strike.  This was an incorrect statement of the law, but defense counsel didn't challenge it.  The judge noted that this was the State's first strike, but went on to say, "Anyway, even if it were [a pattern], I would say that the

12

fact that they thought he had been sleeping and that he was from a different county, residing in a different county, that that would be a sufficient reason to excuse him.  But it will be S-2 rather than for cause."  Defense counsel asked the court to note the objection.

Although it is nowhere argued in the parties' briefs, the record shows that another black juror was excused on the first day of jury selection because of his address.  That was juror number twenty-seven, George Patterson.  His questionnaire **does** appear in the record, and it shows that he was black and that he listed a Jackson address.  Apparently, Patterson had notified the judge and one of the prosecutors on several occasions that he lived in Jackson, and he asked to be excused from the jury. After initially objecting, defense counsel stated that he would not object if that was, indeed, the case. *Batson* was never raised, nor was Patterson's race mentioned during this discussion.  Based on the address on his form, Patterson was excused for cause.  Inexplicably, Patterson's strike was not raised during the next day's discussion on whether Ragsdale should be excused.

The State's next strike was on juror Anita Olive, who was also black.  At that point, the defense raised another *Batson* objection.  The judge asked the prosecutors to state their reason for the strike, and the following exchange occurred:

> MR. BURDICK:  Judge, there is no pattern because Ragsdale, as the Court pointed out, was observed by our staff sleeping.  He showed a different residence.  We had a race neutral reason for that.  Olive, in my opinion, was unattentive.  She's really the first black we've stricken.  So we show no pattern of discrimination, but excuse me just a moment.  Some other notes.

> MR. AINSWORTH:   We would refer to – you used S-2 on it, so that was their strike.

> THE COURT:   Right.

> MR. AINSWORTH:   He's a black.  We have no other blacks on the jury.  Only two that's been presented, they struck both of them, and that's a pattern.

13

MR. BURDICK:   Judge, additionally, she was very – I'm handing the Court the questionnaire.  She didn't fill out half of it.  She did not follow the directions of the Court.  And that backs up my opinion and observation that she was inattentive.  She responded to no questions from either side, and she didn't fill out her complete form.

MR. SWEATT:   We'd like the record to reflect that many of the jurors didn't fill out all the pages of the form, and several of them didn't fill out any form.

MR. BURDICK:   Well, I'm just backing up my original statement she was inattentive and looked like she was preoccupied the whole time.  And she didn't fill out her form.  The second page, Judge.

MR. AINSWORTH:   We don't think that's enough reason for them to strike her because they think she was inattentive and didn't fill out her form.

MS. SONES:   It's a racially neutral reason.

MR. BURDICK:   It's a racial [sic] neutral reason, does not have to rise to a challenge for cause.  Just has to be race neutral.

THE COURT:   I think she filled out the form.

MR. BURDICK:   Well, there's a lot that she didn't fill out.

THE COURT:   I didn't see but one.  That's fraternal organizations.  I assume that means none.

MR. SWEATT:   She did fill out the form, Your Honor?

THE COURT:   Yeah, I think she filled it out.

MR. BURDICK:   My main reason – this wasn't my main reason.  My main reason was that she was inattentive, seemed to be totally preoccupied.  And, again, we're not showing a pattern of discrimination.

At this point, there was a discussion as to whether there were any other blacks on the venire who might be chosen to serve on the jury.  The prosecution notified the court that there was another juror, Melvin Bouldin, number forty-one, whom they planned to accept.  The court ruled, "With the understanding you're going to accept Bouldin, then I'm going to go ahead and allow this one to be

struck as not showing a pattern, then." Ultimately, the State struck six jurors, two of whom were black. Mr. Bouldin was accepted by the State, and he served on the jury. A review of Ms. Olive's questionnaire reveals that she answered every question except the one asking her to list the organizations to which she belonged.

This issue was raised on direct appeal to the Mississippi Supreme Court as a violation of *Batson*. The state court's analysis recognized the three-step process for analyzing *Batson* challenges. *Stevens*, 806 So. 2d at 1046, citing *Stewart v. State*, 662 So. 2d 552, 557-58 (Miss. 1995). However, it held that the State had given reasons for the challenges before the trial court found that a prima facie case of racial discrimination had been made, so the court went on to the third step in the analysis. 806 So. 2d at 1046.

With regard to Ragsdale, the court found that the fact that he no longer resided in Madison County was a sufficiently race-neutral reason to strike him. With regard to Olive, the court noted that the determination of discriminatory intent rested, at least in part, on the prosecutor's credibility in offering reasons for striking her. Because the trial judge was in the best position to assess that credibility, the court held that his findings were entitled to great deference. Since the trial judge had permitted the strike, and because the Mississippi Supreme Court found no reason to hold that decision to be clearly erroneous or against the overwhelming weight of the evidence, the *Batson* claim was denied. *Id.* at 1047-48. The claim was made again in Stevens's petition for post-conviction relief, and it was denied by the Mississippi Supreme Court, repeating its earlier rationale and also finding the issue barred by *res judicata*. *Stevens*, 867 So. 2d at 223.

The findings of the trial court and the Mississippi Supreme Court are entitled to great deference in this habeas review and can only be overturned if they are shown to be unreasonable in

light of the evidence presented.  The Mississippi Supreme Court's application of the law to those facts can only be overturned if it was contrary to or an unreasonable application of United States Supreme Court precedent.  Clearly, the trial court and the attorneys for both sides mistakenly thought that *Batson* required a finding that the prosecutor had engaged in a pattern of discriminating against black jurors in the case at hand.  As stated earlier, *Batson* does not set forth such a requirement.  The Mississippi Supreme Court, however, properly applied *Batson* to the facts, without reference to whether a "pattern or practice" of discrimination had been shown.

The trial court found that the reasons proffered by the prosecutor for striking Ragsdale – that he slept through the first day's proceedings and resided in a different county – were sufficient to justify the strike.  Stevens argues that these findings were unreasonable, in light of the evidence.  First, he argues that, because the trial court had qualified the entire venire at the beginning of voir dire, Ragsdale was found to have been a competent juror and could not have been disqualified based on his residence in another county.  This argument was not raised in the trial court, and it ignores the fact that George Patterson was also struck after the jury was qualified because he lived in Hinds County, with no objection from the defense.  The State's failure to argue this issue is puzzling, but, in the absence of Ragsdale's questionnaire, there is nothing in the record to differentiate Patterson's situation from Ragsdale's.  There is no explanation as to why they were treated differently, except that Patterson had turned his questionnaire in prior to voir dire, and he had apparently been aggressive in seeking to be excused.  While this Court cannot substitute reasons that were not given to support the strike for those that were, neither should the petitioner be permitted to argue new reasons against the strike that are clearly refuted by the record.

16

To support his claim that the reasons for striking Ragsdale were pretextual, Stevens states that even the trial court rejected the factual basis upon which the State attempted to have Ragsdale struck for cause.  However, this claim is likewise not supported by the record.  The court did not reject the claim that Ragsdale lived in another county; the judge stated only that Ragsdale "could still be a registered voter . . . ."  The judge likewise did not reject the State's claim that Ragsdale slept through the voir dire; he just stated that he hadn't noticed it.  As stated earlier, the fact that the trial judge does not see the conduct used to support the strike does not mean that the strike is pretextual.  *Rice*, 546 U.S. at 341.  The judge went on to state that both reasons, while not justifying a strike for cause, justified the peremptory strike.  This is a clear finding of the propriety of the strike and is backed by significant facts, and, in addition, the decision is entirely reasonable.

Stevens also argues that the prosecutor's failure to voir dire Ragsdale about his address suggests that the strike was pretextual.  This argument is based on the Supreme Court's language in *Miller-El*, where the Court held that the prosecutor's failure to make further inquiry on subjects of concern demonstrated discriminatory intent.  However, *Miller-El* did not hold that a prosecutor must, in all circumstances where he is concerned about an issue regarding a juror, conduct additional questioning.  Instead, it held that a *failure* to conduct further voir dire is a factor that may suggest discrimination in a case where the record supports a claim of pretext.  This case seems distinguishable.  First, there is nothing in the record to cast doubt on either Ragsdale's actual residence or whether he was sleeping the day before.  Second, the record shows that a juror was excused for a similar reason the day before, with no further examination and no objection by the defense.  Finally, there is no indication that white jurors in a similar situation were accepted as

17

jurors.  The record does not support Stevens's claim that Mississippi Supreme Court's findings with regard to the Ragsdale strike were unreasonable.

When a *Batson* claim was made regarding Olive's strike, the defendant again claimed that a pattern of discrimination had been shown – a factor, but not a requirement.  The judge apparently believed that a *prima facie* case had been made, since he asked the State to give a reason for the strike.  First, the prosecutor argued that no pattern had been established, but then stated that Olive had been "inattentive" and failed to fill out her questionnaire.  The judge rejected the second reason.  During the discussion that followed, the State notified the court that it planned to accept  Melvin Bouldin, and the court allowed the strike as "not showing a pattern."

Although the trial court misapprehended *Batson,* the Mississippi Supreme Court correctly applied the law and found that the prosecutor had given race neutral reasons for the challenge.  Based upon the deference to be accorded to the trial court's opportunity to assess the prosecutor's demeanor in making the challenge, that court held that the strike was not discriminatory.  806 So. 2d at 1047-48.  This finding is to be accorded the same deference as any made by the trial court.  *Moody*, 476 F.3d at 268.  Moreover, given the record before that court, the finding is not unreasonable, as that term is defined in habeas law.  The prosecutor gave two race-neutral reasons – inattentiveness and failure to complete the questionnaire.  As Stevens has pointed out, white jurors who had neglected to answer some questions on the questionnaire were permitted to serve on the jury, but the trial court had already rejected that explanation as supporting the strike.

Had there not been another reason proffered, the findings of both the trial court and the Mississippi Supreme Court would have been suspect.  This Court might have reached a different conclusion during jury selection, on the same facts.  However, the prosecutor's initial reason for the

18

strike was that Olive had been inattentive, and the fact that the other reason was rejected by the trial court does not mandate a finding that this reason was pretextual.  *Rice*, 546 U.S. at 341.  Another fact supporting the finding of non-discriminatory intent is the prosecutor's acceptance of Melvin Bouldin as a juror.  Allowing one black juror does not insulate the State from a *Batson* charge; one black juror was allowed to serve in *Miller-El*.  Unlike the situation in that case, however, the prosecutor in this case committed to the selection of a black juror early in the process, when he was exercising his second strike.  The issue before the Court is not the striking of a black juror, but the striking of a juror because he is black.  The trial court found this did not occur, and the finding is supported by the facts.

Stevens next argues that the office prosecuting his case had a history of racial discrimination in jury selection in other cases, a factor relevant to the determination of whether a prosecutor's proffered explanations are credible.  *Miller-El*, 545 U.S. at 240.  This particular argument was not raised at trial or on direct appeal, although it was included in his petition for post-conviction relief.  The State argued that the argument was barred from review, and the Mississippi Supreme Court precluded further consideration of this issue on grounds of *res judicata*.  *Stevens*, 867 So. 2d at 222 (citing Miss. Code Ann. § 99-39-21(3) (Supp. 2003)).

The Respondents have not specifically argued to this Court that this argument is barred from review, although they have made a general statement to that effect regarding "many of the substantive claims."  It could be argued that the State has waived this defense by failing to specifically raise it in federal court.  *Mayo v. Lynaugh*, 893 F.2d 683, 686 (5th Cir. 1990) ("This circuit, however, has consistently held that a state waives a procedural-bar argument by failing to present the issue in district court.") It is also clear, however, that this Court may raise and consider

19

a procedural bar *sua sponte*. *Day v. McDonough*, 547 U.S. 198, 209 (2006); *Magouirk v. Phillips*, 144 F.3d 348, 357 (5th Cir. 1998). In doing so, however, the Court should consider whether the petitioner had notice that the defense would be raised and an opportunity to respond to it and whether the failure to raise the defense is inadvertent or purposeful. *Prieto v. Quarterman*, 456 F.3d 511, 518 (5th Cir. 2006).

Here, the claim that Marion County's District Attorney had historically discriminated against blacks in jury selection was raised in Stevens's petition for post-conviction relief, and the State responded that the issue was barred. It would seem, then, that Stevens had notice that default is an issue; he has had an opportunity to respond to the State's argument; and the State's failure to raise the bar again appears to have been inadvertent. This Court could hold that the argument of historical discrimination is barred from consideration; however, out of an abundance of caution, this issue will be analyzed on the merits.

The *Miller-El* opinion cited so extensively in Stevens's pleadings was the Supreme Court's second review of that case. In its earlier opinion, the Court considered a claim that the Dallas County District Attorney's Office had historically discriminated against blacks during jury selection. The Court recited the following evidence:

> A Dallas County district judge testified that, when he had served in the District Attorney's Office from the late-1950's to early-1960's, his superior warned him that he would be fired if he permitted any African-Americans to serve on a jury. Similarly, another Dallas County district judge and former assistant district attorney from 1976 to 1978 testified that he believed the office had a systematic policy of excluding Africa-Americans from juries.
>
> Of more importance, the defense presented evidence that the District Attorney's Office had adopted a formal policy to exclude minorities from jury service . . . . A manual entitled "Jury Selection in a Criminal Case" [sometimes known as the

> Sparling Manual] was distributed to prosecutors.  It contained an article authored by a former prosecutor (and later a judge) under the direction of his superiors in the District Attorney's Office, outlining the reasoning for excluding minorities from jury service.  Although the manual was written in 1968, it remained in circulation until 1976, if not later, and was available at least to one of the prosecutors in Miller-El's trial.

*Miller-El v. Cockrell*, 537 U.S. 322, 334-35 (2003).  In its second opinion, the Court held that this historical evidence was another factor that supported the finding that the reasons given for striking black jurors were pretextual.  545 U.S. at 253.

Stevens argues that the Marion County District Attorney's office has similarly engaged in a practice of excluding blacks from jury service and that this pattern also shows pretext.  He supports this argument with three state court cases: *Alfred v. State*, 821 So. 2d 861 (Miss. Ct. App. 2002); *Conerly v. State*, 544 So. 2d 1370 (Miss. 1989); and *Coggins v. State*, 529 So. 2d 649 (Miss. 1988).  Each of these cases involved convictions from either Marion or Pearl River Counties, which are represented by the same district attorney's office.  According to the pleadings presented in state court, the assistant district attorney who prosecuted *Conerly* and *Coggins* was named McDonald, and he was elected to serve as the Marion County District Attorney prior to Stevens's trial.  However, the State argued in its response to the post-conviction petition that McDonald did not participate in any way in Stevens's trial.  That argument was not refuted by Stevens in his response, although he argues that the strikes in his case occurred under McDonald's "direct supervision."

In the earliest case, *Coggins*, McDonald struck two black jurors.  Among the other reasons given for the strikes, he referred to a seminar on jury selection that indicated that young black men and women would generally be favorable to young black defendants.  The Mississippi Supreme Court held that selection on that basis violated *Batson*.  529 So. 2d at 652.  In *Conerly*, McDonald

struck five black jurors from the venire, and the Mississippi Supreme Court held that the reason given for one of the strikes was pretextual.  544 So. 2d at 1372.  Finally, in *Alfred*, the Mississippi Court of Appeals ordered the Marion County Circuit Court to conduct a *Batson* hearing, during which the State explained its reasons for striking two black jurors.  Although the court noted that the reason given for one of the strikes appeared to embellish the voir dire testimony of that juror, it did not reverse the conviction.  821 So. 2d at 863.

There were two occasions where the Mississippi Supreme Court found that discrimination occurred in the Fifteenth Judicial District in jury selection over the ten years prior to the trial.  There had been hundreds of other trials in the District, and no other finding of discrimination has been made.  The two attorneys who had been charged did not participate in the trial, and the attorneys who did have never been found to have used discriminatory practices in jury selection.  Additionally, no pattern of discrimination had been shown, and the challenged juror was not the same race as the defendant.  While there may be some smoke left over from prior years, there was nothing shown in Stevens's case that indicated that any discriminatory tactics were used in jury selection by the district attorney's office.  Stevens's case is, therefore, distinguishable from the scenario in *Miller-El*, where the Dallas County District Attorney's Office had an official, written *policy* of excluding black jurors.

In conclusion, the striking of juror Ragsdale appears to have been no different than the striking of Patterson the day before, and it should not be the basis for a *Batson* violation.  The striking of juror Olive is somewhat closer, as one of the reasons offered for the strike is not supported by the record and was rejected by the trial judge.  However, based on the deference shown to a finding of non-discrimination in state court, this Court cannot say that the Mississippi Supreme

Court's determination of fact were unreasonable or that its decision unreasonably applied federal law.  Stevens is not entitled to habeas relief on this issue.

**Ground B:**     **The Mississippi sentencing scheme for capital punishment as applied to the Petitioner violates the Eighth and Fourteenth Amendments since it puts the issue of intent beyond the reach of the sentencing jury and allows for capital punishment for unpremeditated felony murders but not for premeditated simple murders.**

The statute that sets forth the factors to be considered in imposing the death penalty requires the jury make at least one of the following findings – that the defendant actually killed the victim, that he intended to kill the victim, that he attempted to kill the victim, or that he contemplated that lethal force would be used.  *Enmund v. Florida*, 458 U.S. 782 (1982), codified in Miss. Code Ann. § 99-19-101(7) (1972 & Supp. 2007).  Stevens argues that this statute permits the arbitrary and capricious imposition of the death penalty because it allows the penalty to be imposed only upon a finding that the defendant actually killed his victim, without a finding of intent.  Thus, he contends, any evidence that he did not intend to kill could have been ignored by the jury during sentencing, because it did not have to find intent to kill to return the death penalty.  According to Stevens, permitting the jury to impose the death penalty under such circumstances had the effect of putting relevant mitigating evidence beyond the reach of the jury, in violation of *Johnson v. Texas*, 509 U.S. 350 (1993).  Additionally, it made the imposition of the death penalty in his case arbitrary and capricious, in violation of the Eighth and Fourteenth Amendments.  *Zant v. Stephens*, 462 U.S. 862 (1983); *Gregg v. Georgia*, 428 U.S. 153 (1976); *Furman v. Georgia*, 408 U.S. 238 (1972).

As will be discussed in more detail in the next section, during the guilt phase of his trial, Stevens offered psychiatric testimony to show that, due to the combined effects of alcohol,

prescription drugs, and a head injury suffered during the accident in his truck earlier on the day of

the murders, he did not have the ability to form specific intent to commit murder.  The trial court

ruled that the testimony was not admissible during the guilt phase, because lack of specific intent

was not a defense to the charge of murder.  The psychiatrist did testify during the sentencing phase,

where the jury sentenced Stevens to death on each of the four counts of murder.  In so doing, the jury

made all of the requisite *Enmund* findings with respect to each count – that Stevens actually killed

each victim, that he intended to kill each victim, that he attempted to kill each victim, and that he

contemplated that lethal force would be used against each victim.

Because of these findings – particularly, the finding that he intended to kill – this argument,

although interesting, does not benefit Stevens.  The same issue was raised in the Fifth Circuit in *Gray*

*v. Lucas*, 677 F.2d 1086, 1103 (5th Cir. 1982).  Although it characterized the argument as posing "a

difficult question of constitutional law, " the court held that it need not be resolved, since the jury

had found that Gray "purposefully" killed his victim to avoid capture.  That court reached the same

decision on rehearing, concluding that, though the argument was "ticklish," the finding that Gray

killed his victim to avoid arrest was, necessarily, a finding of intentional murder.  685 F.2d 139, 140

(5th Cir. 1982).  *See also Edwards v. Thigpen*, 595 F. Supp. 1271, (S.D. Miss. 1984).

Mississippi law does not require a finding of intent to support a charge of capital murder, for

reasons best explained as follows:

> All states have endorsed the common-law concept of felony murder in some
> form. In it the felon is considered "at risk" while committing the felony so that if a
> homicide results, it is considered murder, or, as in our state, capital murder if
> associated with the felonies designated by the legislature. The legislature's intent was
> to protect the citizenry from the evil of the lesser felony by imposing a greater penalty
> upon a homicide occurring during its commission. Some authorities view the felony

murder statutes as imputing or irrebuttably presuming a specific intent to kill from the association of the homicide with the underlying felony. These same authorities acknowledge "(l)ong standing judicial approval of the presumption provides strong indication that the presumption comports with due process."

The appellant argues, however, that only 0.5% of robberies result in homicide. Therefore, it cannot be said the robber in every case intended to kill. This may be true, but we think it overlooks the great danger the aggressor willfully imposes upon his victim. The constituent crime with its hazardous potential is that which the legislature intended to deter by permitting capital punishment if death results from the felonious undertaking.

Presently, we can say without doubt the appellant schemed and participated in the unlawful undertaking which resulted in death. The subjunctive nature of the intention to kill makes it no less deliberate and no less deserving of capital punishment than if it had been expressed, in our opinion. The felon who causes death in furthering his crime manifests a callous disregard for human life, because he subordinates the life of the innocent to his desire for gain, thereby inviting the outrage of a society understandably bent upon protecting itself from physical violence.

*Culberson v. State,* 379 So.2d 499, 507 (Miss.1979) (internal cites omitted).  The Mississippi

Supreme Court considered the issue in this case and held that state law did not require a finding of

intent to kill.  *Stevens*, 806 So. 2d at 1053.  The court also found, "[T]he evidence unquestionably

supports the finding that Stevens intended to kill his victims, and he was aware of what he was doing

at the time the crimes were committed."  *Id*.  This language was reiterated in the court's opinion

denying post-conviction relief.  *Stevens*, 867 So. 2d at 223.

Stevens's contention that he lacked any intent to kill is based on his assertion that a

combination of alcohol, drugs, and a head injury prevented him from having a state of mind that

could form intent.  He attempted to present this evidence during the guilt phase of his trial through

Dr. DeLand.  Dr. DeLand did testify during the sentencing phase, noting that, at the time of the

murders, Stevens was being prescribed an opiate for back pain, as well as a muscle relaxer.  Stevens

reported that he was getting Xanax tablets from a cousin and was drinking.  His family reported head

injuries at the age of six and again at sixteen, and Stevens and his brother both reported that Stevens's head hit the windshield of his truck when he drove it into a ditch on the day the murders were committed.  DeLand read a report from a neuropsychologist who had seen Stevens and diagnosed dysfunction from an old brain injury.  She repeated her earlier proffered testimony and stated that the combination of drugs, alcohol, and head injury combined to change his behavior on the day of the murders.  This is the same evidence proffered during the guilt phase.

On the other hand, the evidence showed that Stevens had made threatening comments about his ex-wife before, which caused his current wife to be alarmed when he methodically armed himself on the afternoon of the murders.  He had the presence of mind to warn his wife, who approached him to beg him not to use his weapons, "This gun is loaded."  When Stevens realized that a visitor had appeared at the trailer, he disappeared into his bedroom until she left, then "shot" out the door to his truck.  He drove the distance from his home to his ex-wife's, parked his truck, entered her trailer, and began shooting his victims.  At some point, he re-loaded his shotgun, and he even used a second gun to kill the Reed family and Heath Pounds.  His daughter testified that he told his ex-wife, "Bitch, I told you that I'd kill you one of these days."  When he returned home, Stevens told his wife that he had just killed a family; he gave her one of his guns, and he hid the other two.  One of the guns that Stevens hid was the shotgun used in the murders, which he placed thirty feet up in a tree.  All of these facts support the jury's finding that Stevens intended to kill, even in light of Dr. DeLand's testimony.  Indeed, Dr. DeLand's testimony is incredible, in light of the totality of the circumstances.  This finding is not unreasonable or contrary to law, and, because this finding was made, Stevens's argument does not support his request for habeas relief.

**Ground C:**     **The trial court violated Petitioner's rights under the Sixth and Fourteenth Amendments by erroneously excluding the testimony of a defense expert during the guilt phase of the trial, which the Petitioner was entitled to present to negate the finding of intent.**

Where the previous argument attacks Mississippi's statutory scheme for defining capital murder, here Stevens argues that the exclusion of Dr. DeLand's testimony during the guilt phase of his trial violated his Sixth and Fourteenth Amendment rights to offer relevant evidence.  According to Stevens, this exclusion violated the principal announced in *Washington v. Texas*, 388 U.S. 14 (1967), that a defendant cannot arbitrarily be denied the right to put on a witness whose testimony would be relevant to his defense.  He argues further that, in affirming the trial court, the Mississippi Supreme Court misunderstood the basis of Dr. DeLand's testimony, which would have established that his impairment was caused *both* by voluntarily intoxication *and* a head injury.

Stevens admits that voluntary intoxication is not a defense to a criminal charge, but he argues that diminished capacity, under the circumstances alleged in his case, is admissible to refute a charge that requires specific intent.  Stevens also admits that capital murder, under Mississippi law, is not a specific intent crime.  However, he argues that the underlying offenses for which he was indicted – burglary and child abuse – are specific intent crimes to which he was entitled to offer a defense. The Respondents disagree, arguing that these underlying offenses were not separate charges.

The relevant language of the indictments for the murders of Heath Pounds and Dylan Lee read as follows:

> On or about the 18th day of October, A.D., 1998 Benny Joe Stevens did wilfully, unlawfully, feloniously and without the authority of law and with deliberate design to cause the death of one Heath Pounds [or Dylan Lee], a human being and a child under the age of twelve (12) years, did kill and murder the said Heath Pounds by shooting him while engaged in the crime of breaking and entering the home of Wesley Reed for the purpose of committing an assault on the occupants of the home

of Wesley Reed and while engaged in the crime of felonious child abuse and/or battery on the said Heath Pounds, a minor child below the age of twelve (12) years, contrary to and in violation of the Sections 97-3-19(2), 97-17-23 and 97-5-39(2) of the Mississippi Code of 1972, as amended.

The indictments for the other two murders were similar, omitting the language describing the victim as a child.  Under Mississippi law, burglary is defined as a breaking and entering of the dwelling house of another, with intent to commit a crime therein.  Miss. Code Ann. § 97-17-23.  The crime of child abuse requires the intent to either burn or torture a child, or to whip, strike or otherwise abuse or mutilate any child in such a manner as to cause serious bodily harm.  Miss Code Ann. § 97-5-39(2).  Despite the Respondents' argument that, as underlying offenses, these were not "separate crimes," the State still had to prove every element of burglary and child abuse beyond a reasonable doubt, including intent.  *Holly v. State*, 716 So. 2d 979, 984 (Miss. 1998).  However, Stevens's argument that his defense to the intent element was improperly excluded fails for several reasons: (1) the jury did find intent in the sentencing phase, after hearing the same evidence; (2) the United States Supreme Court has left to the states the responsibility of defining the elements of crime, including mens rea; and (3) neither diminished capacity nor voluntary intoxication are defenses to crimes in Mississippi.

Some jurisdictions recognize a mental defect, not amounting to insanity, as a defense to a charge of specific intent; other jurisdictions have rejected the defense.  In *Fisher v. United States*, 328 U.S. 463 (1946), the United States Supreme Court considered whether a District of Columbia court properly excluded an instruction permitting consideration of mental infirmities that, while not sufficient to prove insanity, precluded premeditation.  The Court concluded that it was not error, stating "[I]t is established law in the District that an accused in a criminal trial is not entitled to an

instruction based upon evidence of mental weakness, short of legal insanity, which would reduce his crime from first to second degree murder." 328 U.S. at 473.  Reviewing state law on this issue, the Court found that the majority of states rejected a defense based on any mental condition short of insanity.  *Id*. at 474-75 nn.12 & 13.  Expressing its disinclination to force the District of Columbia to fundamentally change its common law theory of responsibility, the Court recognized, "The administration of criminal law in matters not affected by Constitutional limitations or a general federal law is a matter peculiarly of local concern.."  *Id*. at 476.

Later cases have clarified the Court's position that it is uniquely within the province of the states to define both the behavior that will be deemed criminal and the defenses to criminal charges. *Powell v. State*, 392 U.S. 514 (1968).  In *Powell*, the Court reviewed a claim that a conviction for public drunkenness violated the Eighth Amendment where the defendant was an alcoholic, and, therefore, should not be held accountable for his crime.  The Court disagreed with the defendant's claim, noting that it "has never articulated a general constitutional doctrine of mens rea."  *Id*. at 535. Because the issue of alcoholism as a defense to criminal charges did not rise to the level of a constitutional matter, the Court reasoned, it should be left to the states.  *Id*. at 536.  In reaching this conclusion, the Court also discussed the logical extension of developing a "constitutional doctrine of criminal responsibility" based on a recognition of alcoholism as an excuse for criminal behavior. *Id*. at 534.  Its discussion on this issue contains arguments strikingly familiar to the defense raised by Dr. DeLand in this case:

> If Leroy Powell cannot be convicted of public intoxication, it is difficult to see how a State can convict an individual for murder, if that individual, while exhibiting normal behavior in all other respects, suffers from a "compulsion" to kill, which is an "exceedingly strong influence," but "not completely overpowering."  [Cite

omitted.]   Even if we limit our consideration to chronic alcoholics, it would seem impossible to confine the principle within the arbitrary bounds which the dissent seems to envision.

It is not difficult to imagine a case involving psychiatric testimony to the effect that an individual suffers from some aggressive neurosis which he is able to control when sober; that very little alcohol suffices to remove the inhibitions which normally contain these aggressions, with the result that the individual engages in assaultive behavior without becoming actually intoxicated; and that the individual suffers from a very strong desire to drink, which is an "exceedingly strong influence" but "not completely overpowering."

*Id*.

Several years after *Powell*, the Court was called upon to consider the claim that Montana had violated due process rights by legislatively preventing juries from considering voluntary intoxication when determining the mental state of a defendant.  *Montana v. Egelhoff*, 518 U.S. 37 (1996).  The defendant had been charged with two counts of deliberate homicide; while he was permitted to introduce evidence of his intoxication in support of his claim that he was too drunk to have committed the murders, the jury was instructed that it could not consider intoxication in determining the existence of a mental state that was an element of the offense.  He argued that the instruction violated his due process right to present, and have the jury consider, all evidence relevant to his defense to the charges.  518 U.S. at 42.  After extensively reviewing the common law history related to the use of intoxication as a defense, the Court held that no fundamental principle was involved.  518 U.S. at 48-50.  Citing *Powell*, the Court held that the Due Process Clause did not prevent Montana from disallowing consideration of voluntary intoxication on the issue of the defendant's state of mind.  *Id*. at 56.  In her concurring opinion, Justice Ginsburg agreed.  "Comprehended as a measure redefining *mens rea*, [the Montana statute] encounters no constitutional shoal.  States enjoy wide latitude in defining the elements of criminal offenses, particularly when determining 'the extent

30

to which moral culpability should be a prerequisite to conviction of a crime.'"  *Id*. at 58 (quoting *Powell*, 392 U.S. at 545 (internal citations omitted)).

Finally, in 2006, the Supreme Court decided *Clark v. Arizona*, 548 U.S. 735 (2006).  *Clark* involved a criminal bench trial in which the court permitted the defendant to introduce expert testimony regarding his mental illness, but held that it would only be considered on the question of insanity, not to disprove intent.  The defendant alleged that the failure to consider the evidence on the issue of mens rea violated his due process rights.  The Court disagreed, recognizing the traditional deference afforded to the states in defining criminal behavior and defenses, as well as devising evidentiary rules.  548 U.S. 768-70.  Since the evidence was not being excluded entirely, but only channeled, the Court found no due process violation.  Holding otherwise, the Court reasoned, would eviscerate the *M'Naghten* standard for insanity by permitting a defendant to avoid prosecution by providing evidence of a lesser mental defect.  *Id*. at 773-74.  Additionally, the Court in *Clark* appeared to differentiate between the level of evidence of mental disease and incapacity sufficient to counter mens rea and that which would only establish diminished capacity.  *Id*. at 773 n.42.  Thus, disorders resulting from voluntary intoxication, withdrawal from alcohol or drugs or impulse control disorders would not negate intent in any event, but only related to a defense of diminished capacity, which the Court said a state may preclude as a defense to a crime.

Stevens's argument that his claim arises from the Sixth Amendment, rather than the Fourteenth, does not change the outcome.  As the Supreme Court has noted, the meaningful opportunity to present a complete defense arises from both the Due Process Clause of the Fourteenth Amendment and the Compulsory Process and Confrontation Clauses of the Sixth Amendment. *Crane v. Kentucky*, 476 U.S. 683, 690 (1986).  As stated in *Strickland v. Washington*, "The

Constitution guarantees a fair trial through the Due Process Clauses, but it defines the basic elements of a fair trial largely through the several provisions of the Sixth Amendment." 466 U.S. 668, 684-85 (1984). For the Court's purposes, the analysis is the same; the State must advance a valid justification to exclude any evidence that would counter the prosecution's case. *Crane*, 476 U.S. at 690.

The Due Process Clause includes the rights "to confront and cross-examine witnesses and to call witnesses in one's own behalf . . . ." *Chambers v. Mississippi*, 410 U.S. 284, 294 (1973). However, the Supreme Court has made it clear that, even in a criminal case, evidence relevant to the defense may be excluded on procedural grounds. *Michigan v. Lucas*, 500 U.S. 145, 151 (1991). The Due Process Clause would be violated only if the exclusion of the evidence violated a fundamental principle of justice. *Patterson v. New York*, 432 U.S. 197, 201-202 (1977). The Court in *Chambers* recognized the evidentiary limitations of that right, "In the exercise of this right, the accused, as is required of the State, must comply with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence." *Id*. at 302. While Chambers's conviction was reversed on due process grounds, the Court warned that its holding was highly fact-specific and did not "signal any diminution in the respect traditionally accorded to the States in the establishment and implementation of their own criminal trial rules and procedures." *Id*. at 302-303.

Stevens also cites *Taylor v. Illinois*, 484 U.S. 400 (1988) and *Washington v. Texas*, 388 U.S. 14 (1967), each of which involved an assertion that the exclusion of defense witnesses' testimony violated the Compulsory Process Clause of the Sixth Amendment. In *Washington*, the Court found that the Sixth Amendment had been violated by an "arbitrary" rule prohibiting testimony from a co-

32

defendant.  That holding would apply to Stevens's case if the exclusion of Dr. DeLand's testimony rested on an arbitrary rule; however, the Supreme Court has specifically found the exclusion of evidence of a mental disorder short of insanity is permissible, not "arbitrary."  In *Taylor*, the Court found that there was no constitutional violation in excluding evidence as a discovery sanction, declaring "The accused does not have an unfettered right to offer testimony that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence."  484 U.S. at 410.

Stevens's argument that he should have been permitted to present Dr. DeLand's evidence during the guilt phase to negate intent is foreclosed by the fact that he was permitted to present the identical testimony to the jury in the sentencing phase.  Despite that testimony, the jury made all four *Enmund* findings with respect to all of the murders, including finding that Stevens intended to kill the children and that he also intended that lethal force would be used against them.  These findings satisfy the "intent to commit a crime" element of burglary and also the "intent to injure a child" element of child abuse.  Thus, the jury's findings of intent preclude this argument.

The Supreme Court has made it clear that Mississippi is constitutionally permitted to define the elements of crimes, including intent.  To the extent that Dr. DeLand's opinion rested on evidence that Stevens was intoxicated, it was inadmissible under Mississippi  law, which does not recognize voluntary intoxication as a defense to a crime under any circumstances, even where the purpose of the evidence is to negate a charge requiring specific intent.  *Peterson v. State*, 671 So. 2d 647, 660 (Miss. 1996); *Lanier v. State*, 533 So. 2d 473, 478-79 (Miss. 1988). Likewise, as is constitutionally permissible, Mississippi does not recognize the defense of diminished capacity short of M'Naughten insanity, even to negate intent.  *Cannaday v. State*, 455 So. 2d 713, 720 (Miss. 1984); *Edwards v. State*, 441 So. 2d 84, 88 (Miss. 1983); *Hill v. State*, 339 So. 2d 1382, 1385 (Miss. 1976).  The record

shows that Dr. DeLand admitted that her testimony did not relate to the M'Naghten standard, and defense counsel agreed that she was not going to testify on the issue of insanity, but only as to intent. In reviewing the exclusion of Dr. DeLand's testimony on direct appeal, the Mississippi Supreme Court held that it was properly rejected, recognizing that diminished capacity is not a defense to a criminal charge in Mississippi, and, therefore, "that the trial court properly did not introduce evidence to establish a defense of diminished capacity that does not stand up to the *M'Naughten* test for legal insanity during the guilt phase." *Stevens*, 806 So. 2d at 1051.  This holding was reiterated in the decision on post-conviction relief. *Stevens*, 867 So. 2d at 224.  Considering the circumstances of this case, the Mississippi Supreme Court's decision does not appear to be contrary to or an unreasonable application of any clear federal precedent, and this ground for habeas relief should be rejected.

**Ground D:**     **The trial court's proceeding on the indictment violated the Double Jeopardy Provisions of the Fifth Amendment of the Constitution of the United States.**

Stevens's argument on this Ground is actually based on three contentions: (1) the indictment was vague because it did not contain sufficient detail of the facts supporting the felony child abuse and burglary charges; (2) the crimes of child abuse and burglary should have merged into the crime of capital murder, thus making it inappropriate to elevate the murders to capital murders on these underlying offenses; and (3) the charge of murder for each victim was enhanced by underlying offenses that used murder as an element, thus violating the Double Jeopardy Clause of the Fifth Amendment.  The indictment against Stevens charged with him four counts of capital murder, each relying on a charge that Stevens committed murder while: (1) engaged in the act of burglary, by breaking and entering the Reed home for the purpose of committing an assault upon its occupants,

and (2) engaged in the act of committing felonious child abuse.  Additionally, Stevens was charged with an aggravated assault on Erica Stevens.

On appeal, Stevens stated that the indictment was vague, but he failed to cite any authority to that effect or to provide any meaningful argument.  The Mississippi Supreme Court has long held that such a failure waives consideration of an issue.  *See, e.g., Bennett v. State*, 933 So. 2d 930, 944 (2006).  In its opinion on the direct appeal of Stevens's case, that court did not specifically address the allegation that the indictment was vague, nor was any mention made of it in the opinion on post-conviction.  In his habeas brief, Stevens only relates that the indictment relied on the underlying offenses of burglary and felony child abuse.  "Accordingly, the indictment was vague and did not provide effective notice as to how to defend the charges contained therein."  Although he later argues that the indictment was constitutionally defective for failing to list all of the aggravating circumstances, there is no further meaningful argument on the issue of vagueness, nor is there any citation to authority on this issue; it has been waived.  *Jackson v. Dretke*, 181 F. App'x 400, 411 n.19 (5th Cir. 2006).

Stevens next argues that the charge of felony child abuse should have merged into the murder charge, since the only act of felony child abuse was the murder.  Merger is a judicially created doctrine intended to prevent multiple punishments for the same offense, in contravention of legislative intent.  Thus, in *Blockburger v. United States*, 284 U.S. 299 (1932), the Court was called upon to determine how many violations of the Harrison Narcotic Act occurred where there were multiple sales to the same person of morphine, not from the original stamped package.  These offenses were charged separately, along with a charge that the sales were made not in pursuance of

a written order in proper form.  The defendant argued that the two sales, as well as the third charge, were all one offense for which only one penalty could be imposed.

The Court disagreed with this argument on grounds of statutory construction; the Double Jeopardy Clause was never mentioned.  Its analysis on the multiple sales was straightforward; each sale constituted a separate transaction, making the offense complete.  *Id*. at 303.  The Court then looked to whether a single sale could constitute *both* the offense of selling the drug in other than the original package *and* the offense of selling without a proper written order.  "The applicable rule is that, where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not."  *Id*. at 304.  Even though the sale was only one transaction, since one statute prohibited sales from other than the original package, while the other statute prohibited sales without a proper written order, two offenses were committed.

The concepts of merger and double jeopardy are similar, but not identical.  As the Supreme Court has stated on several occasions, the Double Jeopardy Clause of the Fifth Amendment protects criminal defendants from prosecution in three circumstances: (1) where the state attempts a second prosecution for the same offense after an acquittal; (2) where the state attempts a second prosecution for the same offense after a conviction; or (3) where the state attempts to impose multiple punishments for the same offense in one proceeding.  *Jones v. Thomas*, 491 U.S. 376, 381 (1989).  Stevens's argument is based on the third circumstance; he argues that the imposition of the death penalty in his case is tantamount to punishing him twice for the same offense.  He cites no United States Supreme Court authority to this effect.  In all of the cases he does cite, there were either multiple prosecutions or multiple sentences.

36

What the Supreme Court has held is that the purpose of the Double Jeopardy Clause is to "ensure that sentencing courts do not exceed, by the device of multiple punishments, the limits prescribed by the legislative branch of government, in which lies the substantive power to define crimes and prescribe punishments." *Id*. (citing *Ohio v. Johnson*, 467 U.S. 493, 499 (1984)).  Thus, in *Jones*, where the defendant was sentenced to fifteen years for attempted robbery and life for attempted murder, the Court held that a double jeopardy claim arose "only because the Missouri Legislature did not intend to allow conviction and punishment for *both* felony murder and the underlying felony."  491 U.S. at 381.  *Brown v. Ohio*, 432 U.S. 161 (1977), cited by Stevens in support of his argument, also holds that the constitutional guarantee against double jeopardy "is limited to assuring that the court does not exceed its legislative authorization by imposing multiple punishments for the same offense." *Id*. at 166.   The Court in *Brown* analyzed the double jeopardy claim by referring to the state courts' interpretation of the relevant criminal statutes, which it termed "the final authority."  432 U.S. at 167.

Because the Double Jeopardy Clause has been traditionally invoked to bar successive trials on the same charge, it appears that the case of *Ex parte Lange*, 85 U. S. 163 (1873), marks the Court's first application of the constitutional protection to a case involving multiple punishments from the same trial.  There, the defendant had been sentenced under a statute that authorized *either* a fine or imprisonment.  The prisoner had been given both and remained imprisoned after he had paid the fine.  The Court ordered him discharged, holding "[W]e do not doubt that the Constitution was designed as much to prevent the criminal from being twice punished for the same offense as from being twice tried for it."  *Id*. at 173.

After *Lange*, many years passed before the Court again considered the imposition of multiple punishments in the same trial to implicate double jeopardy concerns, rather than just the common-law principle of merger.  In his dissent in *Whalen v. United States*, 445 U.S. 684 (1980), Justice Rehnquist set out the history of the two theories, citing *Bell v. United States*, 349 U.S. 81 (1955), as the next instance where double jeopardy considerations were applied to charges arising out of the same prosecution.  Justice Rehnquist advocated use of the merger doctrine over double jeopardy analysis, considering it more deferential to the state.  However, he joined in the majority opinion in *Jones*, in which the Court analyzed the imposition of two sentences in the same proceeding under the Double Jeopardy Clause.

Stevens cannot prevail here under either analysis.  He has been subjected to neither multiple punishments nor multiple proceedings, so there is no double jeopardy or merger issue to decide.  He has cited no United States Supreme Court case holding that the use of murder to establish an underlying offense to the crime of capital murder has subjected him to double jeopardy, in contravention of the intent of the legislature.  In a related context, the Court has held that the use of a prior offense to enhance the punishment for a second offense does not implicate double jeopardy concerns.  *Moore v. Missouri*, 159 U.S. 673, 677 (1895); *see also Smallwood v. Johnson*, 73 F.3d 1343 (5th Cir. 1996).  More recently, the Court has refused to consider a sentencing court's failure to find any particular aggravating circumstance as an "acquittal" on that circumstance, holding "[a]ggravating circumstances are not separate penalties or offenses . . . ."  *Poland v. Arizona*, 476 U.S. 147, 156 (1986).  Stevens cites no authority supporting his claim that he has been "effectively" convicted or punished more than once for the same charge.  Because there have been neither multiple punishments nor multiple proceedings, there is no double jeopardy issue.

Even without such explicit authority, Stevens has not convincingly argued that any prior opinion of the United States Supreme Court should be extended to the situation where the commission of one crime is either used to define a more serious offense or used to enhance the punishment for it.  The merger doctrine, as represented by *Blockburger*, is intended to prevent multiple prosecutions or punishment for charges that have the same elements of proof.  Stevens argues that the crime of felony child abuse should merge into the murder charge, and he cannot, therefore, be punished for both.  Either the merger doctrine or considerations of double jeopardy require this Court to determine whether the Mississippi Legislature intended to allow the court to punish a conviction for felony child abuse that results in death by characterizing it as capital murder. *Brown v. Ohio*, 432 U.S. 161, 165 (1977) ("The legislature remains free under the Double Jeopardy Clause to define crimes and fix punishments; but once the legislature has acted courts may not impose more than one punishment for the same offense and prosecutors ordinarily may not attempt to secure that punishment in more than one trial."); *Davis v. Herring*, 800 F.2d 513, 516 (5th Cir. 1986) ("The legislature may impose whatever punishments it sees fit for any combination of crimes subject only to the limitations of the eighth amendment.").

The statutory provision defining murder is found in §97-3-19(1), describing murder as the "killing of a human being without the authority of law . . . when done with deliberate design to effect the death of the person killed, or of any human being."  The statute goes on to define capital murder as including such a killing "when done without any design to effect death by any person engaged in the commission of the crime of felonious child abuse and/or battery of a child in violation of subsection (2) of Section 97-5-39, or in any attempt to commit such felony." §97-3-19(2)(e).  In this context, as aptly pointed out by Justice Robertson in his concurrence in *Faraga v. State*, 514 So. 2d

39

295, 311-314 (Miss. 1987), child abuse is not so much an "underlying felony" as an element of the offense of capital murder.  Thus, the merger doctrine does not really apply, except to prevent a later prosecution for child abuse.  In the majority opinion in *Faraga*, the Mississippi Supreme Court rejected the merger doctrine, on grounds that "different societal interests" were served by the capital murder and felony child abuse statutes.  *Id*. at 303.

In the opinion on direct appeal in Stevens's case, the Mississippi Supreme Court cited *Faraga*, but appeared to reach a slightly different conclusion.  There, the court relied more on statutory construction to hold that the legislative intent of the capital murder statute was to categorize instances of child abuse that resulted in death as capital murder.  806 So. 2d at 1044.  ("We find that it was the intent of the Mississippi Legislature under Miss. Code Ann. §97-5-39(2) that the intentional act of murdering a child by any manner or form constitutes felonious child abuse and, therefore, constitutes capital murder under Miss. Code Ann. §97-3-19(2).")  This rationale does not really rely on the merger doctrine or the Double Jeopardy Clause, but is merely a matter of statutory construction to which this Court should defer.  *Illinois v. Vitale*, 447 U.S. 410, 416 (1980).  Stevens has not shown that this pronouncement is contrary to or unreasonably applies established federal precedent.

Moreover, Stevens's argument relies on his contention that there was only one single act perpetrated against each child, and that was the actual murder; however the record does not support this argument.  Stevens was indicted for violating §97-5-39(2), which defines felony child abuse as (1) intentionally burning a child; (2) intentionally torturing a child; or (3) intentionally whipping, striking or otherwise abusing or mutilating a child in such a manner as to cause serious bodily harm.  The element of torture can exist independently of the element of bodily harm.  *Wolfe v. State*, 743

40

So. 2d 380, 385 (Miss. 1999).  The jury was instructed that child abuse "shall mean the torture of a child or otherwise abuse [sic] or to mutilate any child in such a manner as to cause serious bodily harm or death to said child."  The evidence indicates that Heath Pounds was shot twice and that he was in a defensive posture when he was shot the second time.  The first shotgun blast to his face could constitute abuse prior to his subsequent murder.  The record also indicates that Wesley was shot first, Erica second, and Glenda, perhaps, third.  The fact that the children witnessed some or all of these shootings before they were killed could support a finding that they were "tortured" prior to death, within the meaning of the statute.

Stevens makes the same argument on the burglary charge – that the State alleged that his felonious intent when he entered the home was to commit murder, which was then used to establish the underlying charge of burglary that elevated the murder to capital murder.  This argument is refuted by the indictment, which says that he intended to assault the occupants of the Reed trailer.  Nonetheless, the Mississippi Supreme Court addressed this issue and held that the use of murder to establish burglary and then capital murder did not violate the intent of the Mississippi Legislature.  Citing *Smith v. State*, 499 So. 2d 750 (Miss. 1986), the court held that the crime of burglary predicated on intent to murder did not merge into the capital murder statute.  806 So. 2d at 1045.  (In *Smith*, the court stated, "When the appellant entered the home of Helen Erckhart with the intent to commit a crime therein, i.e., to kill Carter, the burglary was complete and the subsequent killing of Carter elevated the crime of murder to that of capital murder."  499 So. 2d at 754.)  Again, this is a matter of statutory construction, not merger or double jeopardy, because only one punishment and one proceeding were involved.

Stevens also argues that the capital murder statute is unconstitutional, as applied to him, because it did not properly narrow the class of death eligible defendants, citing *Lowenfeld v. Phelps,* 484 U.S. 231 (1988).  His argument here is that the State erred by using the same facts to narrow both at the guilt phase and the penalty phase.  The Supreme Court has held that states must have capital sentencing schemes that narrow the class of persons eligible for the death penalty, thus distinguishing those defendants from others found guilty of murder.  *Lowenfeld*, 484 U.S. at 244. Most states narrow at the sentencing phase, where the jury must find at least one aggravating circumstance, but the narrowing function can also occur during the guilt phase, by defining what constitutes a capital murder. *Brown v. Sanders*, 546 U.S. 212, 216 n.2 (2006);  *Jurek v. Texas*, 428 U.S. 262, 269 (1976).  There is no requirement in the law that the narrowing function occur twice, so Stevens's argument is unavailing, so long as Mississippi's statute performed a narrowing function at either phase.  Since he admits that narrowing occurred at the sentencing phase, there is no merit to this contention.

Finally, Stevens argues that the aggravating circumstances on which the State intended to rely were not listed in his indictment, in violation of *Ring v. Arizona*, 536 U.S. 584 (2002), and *Apprendi v. New Jersey*, 530 U.S. 466 (2000).  This argument was considered on post-conviction, and the Mississippi Supreme Court rejected it.  Part of that court's rationale, in which it failed to apply *Ring* retroactively, was in error, as *Ring* was decided before Stevens's case was final – a fact admitted by the Respondents.  However, the opinion went on to state that *Apprendi's* holding – that aggravating circumstances on which a federal prosecutor intends to rely must be listed in an indictment – did not apply to state courts.  It further held that  *Ring* did not subsequently extend *Apprendi's* holding on indictments to state court.  Stevens has not shown that the Mississippi Supreme Court's decision is

contrary to or an unreasonable application of clearly established federal law because there has been

no later case from the United States Supreme Court that suggests otherwise.  *See Simpson v.*

*Quarterman*, No. 1:04-CV-485, 2007 WL 1008193 at \*21 (E.D. Tex. Mar. 29, 2007) ("Neither

*Apprendi* nor *Ring* held that aggravating factors in a state capital case must be pleaded in the

indictment.")  Therefore, Stevens's argument here has no merit.

**Ground E**:     **Petitioner's conviction and sentence are unreliable, in violation of his Fifth, Sixth, Eighth, and Fourteenth Amendment rights guaranteed by the United States Constitution, due to the cumulation of errors in his trial.**

Stevens argues that all of the errors alleged in his Petition for Writ of Habeas Corpus, when

considered together, mandate that his conviction and sentence be reversed as unreliable.  This claim

was not raised on direct appeal; however, it was raised in post-conviction.  The Mississippi Supreme

Court denied the claim, stating that the errors that Stevens alleged had no merit.  "Therefore, there

can be no *cumulative* error."  *Stevens*, 867 So. 2d at 225.  This decision is in accord with Mississippi

law, which holds that the errors that are accumulated need not, in themselves, be reversible;

however, where there is *no* error, harmless or otherwise, there can be no cumulative effect of errors

that requires reversal.  *Lynch v. State*, 951 So. 2d 549, 555 (Miss. 2007).

Stevens cannot show that this decision was contrary to, or an unreasonable application of,

clearly establish federal law set forth by the United States Supreme Court.  There is no Supreme

Court case on this issue, although the Court has been called upon in other cases to set a standard for

cumulative error review.  The Fifth Circuit in *Derden v. McNeel*, 978 F.2d 1454 (5th Cir. 1992) (en

banc), *cert. denied,* 508 U.S. 960 (1993), adopted a rigorous standard for cumulative error analysis:

"[W]e now hold that federal habeas corpus relief may only be granted for cumulative errors in the

43

conduct of a state trial where (1) the individual errors involved matters of constitutional dimension rather than mere violations of state law; (2) the errors were not procedurally defaulted for habeas purposes; and (3) the errors 'so infected the entire trial that the resulting conviction violates due process.'"978 F.2d at 1456 (quoting *Cupp v. Naughten*, 414 U.S. 141, 147 (1973)).  *Derden* continues to be followed in the Fifth Circuit. *See, e.g., Turner v. Quarterman*, 481 F.3d 292, 301 (5th Cir. 2007). (Repeating the language from *Derden* quoted above and stating, "As is apparent from this standard and as this court has stated explicitly, where individual allegations of error are not of constitutional stature or are not errors, there is 'nothing to cumulate.'").

Each individual error alleged by Stevens has been considered and found to be without merit. This is not the situation where there are several constitutional errors that are, in themselves, harmless, but, when accumulated, cast doubt on the validity of the verdict.  Therefore, as in *Turner*, there is nothing to cumulate, and this argument cannot be the basis for habeas relief.

**Ground F:     The trial court violated Petitioner's Fifth, Eighth and Fourteenth Amendment rights by allowing the testimony of Petitioner's wife against him, in clear violation of Mississippi's evidentiary rules regarding the husband/wife privilege (as defined by Mississippi case law).**

Stevens argues that compelling his wife, Lauren Stevens, to testify violated Miss. R. Evid. 504, which protects confidential communications between husband and wife.  This issue was argued extensively in the trial court, and the judge found that the circumstances of this case fit it into one of the exceptions to the testimonial privilege.   Stevens pressed this issue on appeal, and the Mississippi Supreme Court agreed that Lauren's testimony was admissible, under the exception provided in Rule 504(d)(1), where one spouse is charged with a crime against a minor child.

*Stevens*, 806 So. 2d at 1050.  On post-conviction, the court repeated that ruling.  *Stevens*, 867 So. 2d at 224.

In making his argument here, Stevens contends that the admission of Lauren's testimony violated his Fifth, Eighth, and Fourteenth Amendment rights under the Constitution of the United States.  In support of this claim, Stevens cites several United States Supreme Court cases, including *Trammel v. United States*, 445 U.S. 40 (1980);*Hawkins v. United States*, 358 U.S. 74 (1958);  *Blau v. United States*, 340 U.S. 332 (1951); and *Wolfle v. United States*, 291 U.S. 7 (1934).  Each of these cases was an appeal of a federal prosecution, and the issue was whether the spousal privilege should be recognized as a matter of federal evidentiary law.  None of these cases recognized a constitutional basis for the privilege at issue, because the recognition of testimonial privileges by federal courts is based on common-law principles.  *Jaffee v. Redmond*, 518 U.S. 1, 9 (1996); *Trammel*, 445 U.S. at 47.  In fact, in *Hawkins*, the Court specifically noted that the marital privilege could be altered at will by legislation or by the courts, thereby negating any claim that the right was of constitutional dimensions.  358 U.S. at 78.

The admissibility of evidence is an issue of state law, not ordinarily cognizable on habeas review. *Lockett v. Anderson*, 230 F.3d 695, 709 (5th Cir. 2000).  As the Supreme Court has made clear, in the context of habeas review, "mere errors of state law are not the concern of this court, unless they rise for some other reason to the level of a denial of rights protected by the United States Constitution."  *Barclay v. Florida*, 463 U.S. 939, 957-58 (1983).  Thus, in a case rejecting a petitioner's habeas claim that a conversation with his priest should have been excluded under the priest-penitent privilege, the Fifth Circuit held, "[I]n reviewing a habeas petition we may not examine whether a state court has acted according to its state's law."  *Welch v. Butler*, 835 F.2d 92,

45

95 (5th Cir. 1988) Other courts have specifically rejected claims of maritial privilege as grounds for habeas relief, holding that such claims did not present constitutional issues. *Nance v. Nelson*, No. 93-CV-3295, 1995 WL 380803 (10th Cir. June 21, 1995); *Shults v. Whitley*, No. 91-16900, 1992 WL 383314 at *1 (9th Cir. 1992); *Byrd v. Armontrout*, 880 F.2d 1, (8th Cir. 1989) *Labbe v. Berman*, 621 F.2d 26, 27 (1st Cir. 1980); *Rankin v. Roberts*, 788 F. Supp. 521, 523 (D. Kan. 1992), *aff'd*, 9 F.3d 117 (10th Cir. 1993) ("The marital privilege is merely a testimonial privileged based on statutory provision or found in the common law . . . [and] does not rise to the level of the constitutionally guaranteed right against self-incrimination under the Fifth Amendment."). Stevens has not shown that the admission of Lauren's testimony implicated any rights guaranteed by the Constitution of the United States, and he cannot prevail on this issue.

**Ground G:** **The trial court Violated Petitioner's Fifth and Fourteenth Amendment rights as set forth in the United States Constitution when it erroneously denied Petitioner's motion for severance of the counts included in the indictment.**

Stevens argues that the trial court's failure to grant his motion to sever the four counts of capital murder allowed the state to present evidence of four distinct crimes in one proceeding, thereby playing on the emotions and passions of the jury. This issue was addressed by the Mississippi Supreme Court on direct appeal, where the court recognized that Miss. Code Ann. § 97-7-2 (Supp. 2007) permitted such a joinder, where the offenses "are based on the same act or transaction . . . or . . . based on two or more acts or transactions connected together or constituting parts of a common scheme or plan." To justify joinder, the court held, the State bears the burden of proving that the indictment falls within the language of the statute. *Stevens*, 806 So. 2d at 1042 (citing *Eakes v. State*, 665 So. 2d 852, 861 (Miss. 1995)). If the first provision of the statute – that

the offenses are the result of the same act or transaction – cannot be satisfied by the facts of the case,

then the intervening time period between the acts constituting the offenses must be insignificant.

806 So. 2d at 1042.  In holding that the circumstances of this case justified a multi-count indictment,

the court held:

> [I]t is clearly evident that the four murders of Wesley, Glenda, Heath and Dylan, as
> well as the assault of Erica, all occurred on October 18, 1998, at the trailer occupied
> by Wesley, Glenda, Dylan and Erica.  The murders and the assault occurred one after
> the other in a series of events arising out of the same acts or transactions which
> constituted a common scheme or plan to murder everyone inside that trailer on
> October 18, 1998.  There existed no gaps in time between the crime.

806 So. 2d at 1042.

There are no United States Supreme Court cases that judge the propriety of joinder in a

habeas review.  Generally, other federal courts have deferred to the sound discretion of the trial judge

in such cases.  *Proctor v. Butler*, 831 F.2d 1252, 1256 (5th Cir. 1987); *Alvarez v. Wainwright*, 607

F.2d 683 (5th Cir. 1979); *Moody v. Wilson*, No. 2:04cv117, 2007 WL 892445 at *17 (S.D. Miss.

2007).  For this ground to have merit, the simultaneous trial of more than one offense must actually

render the petitioner's trial fundamentally unfair and, therefore, violative of due process.  *Alvarez*,

607 F.2d at 685.  To establish that level of prejudice, the petitioner would have to show that the

impermissible joinder affected the verdict.  *Breeland v. Blackburn*, 786 F.2d 1239, 1242 (5th Cir.

1986).  Where the offenses joined arose from the same criminal episode and evidence of each

offense would have been admissible at the trial of the other, there is no prejudice resulting from the

joinder. *Bourgeois v. Whitley*, 784 F.2d 718, 722 (5th Cir. 1986); *Tribbitt v. Wainwright*, 540 F.2d

840, 841 (5th Cir. 1976).

Prejudice may result where a prosecutor joins a weak evidentiary case with a strong one, hoping that the multiplicity of charges will confuse or inflame the jury into convicting in the absence of adequate evidence.  *Lucero v. Kerby*, 133 F.3d 1299, 1315 (10th Cir. 1998).  Prejudice may also arise where the cumulative effect of the evidence may cause the jury to convict on all charges when the evidence as to each count would not likely have resulted in a conviction if tried separately. *Herring v. Meachum*, 11 F.3d 374, 377 (2nd Cir. 1993).  Finally, there may be a tendency for a jury to view a defendant charged with multiple crimes more unfavorably than a defendant charged with only one.  *Id*.  In a different context (review of the use of prior convictions in a case charging recidivism) the United States Supreme Court recognized these possibilities of prejudice, but justified them on the grounds that "(1) the jury is expected to follow instructions in limiting this evidence to its proper function, and (2) the convenience of trying different crimes against the same person . . . in the same trial is a valid governmental interest."  *Spencer v. Texas*, 385 U.S. 554, 562 (1967).

Here, the State did not tie a weak case to a stronger one – the evidence against Stevens in each count of the indictment was roughly the same.  The evidence against him was overwhelming, and it was not likely that four different juries would have returned different verdicts.  Moreover, evidence of the murders of the children, and the assault on Erica, would have been admissible in the trials for the murders of Wesley and Glenda, as they established the crimes of burglary and child abuse.  For these reasons, and because Stevens has not shown that the decision of the Mississippi Supreme Court was contrary to or an unreasonable application of federal law, this argument should be rejected as a grounds for habeas relief.

**Ground H:     Petitioner was denied his Fifth, Sixth, Eighth, and Fourteenth Amendment rights guaranteed by the United States Constitution when the trial court improperly denied Petitioner's pretrial motion and later request to delay the sentencing phase of his trial.**

Stevens argues that the trial court denied his constitutional rights by failing to grant his pre-trial motion, and subsequent oral request, to delay the sentencing phase of his trial.  His motion asked the court to delay the sentencing phase of his trial for at least three days after the rendering of a guilty verdict.  Prior to trial, Stevens argued this motion to the trial judge, asking for "some delay to help – not help, but to give us time to prepare for the sentencing phase . . . ."  The judge did not rule on the motion at that time, but stated, "[W]e'll wait and see.  At the time, there may be some circumstance that may cause it to be delayed somewhat, but it's usually in the best interest of everyone to go ahead and proceed on."  There was no further discussion at that time.  The jury returned guilty verdicts at around 11:30 a.m. on December 3, 1999.  After they were read, counsel for Stevens requested that the court break for lunch and start back at around 1:00 p.m.  After some discussion, during which counsel for the State agreed that it would be better to break at that time, the court recessed the proceedings until 1:00.

On appeal, Stevens argued that the denial of his motion to delay the sentencing phase was error.  The Mississippi Supreme Court did not discuss the pretrial motion, but held that Stevens's argument was procedurally barred by defense counsel's request to only delay the sentencing hearing until 1:00 and the trial court's granting that request.  Additionally, citing Miss. Code Ann. § 99-19-101(1) (1972), which requires the trial court to conduct the sentencing hearing "as soon as practicable," the court held that there was no substantive error.  *Stevens*, 806 So. 2d at 1053-54.  The issue was not raised in the post-conviction proceedings.  In his habeas petition, Stevens argues that,

49

given the motion's request for three days' delay, the trial court should have, at least, recessed for the remainder of the afternoon and begun the sentencing phase on the morning of the next day.

Although Stevens describes the trial court's treatment of his pretrial motion as a denial, it appears from the record that the court merely deferred ruling on it.  Under Mississippi law, the burden is on the movant to obtain a ruling on a pretrial motion; failure to obtain a ruling operates as a waiver. *Berry v. State*, 728 So. 2d 568, 570 (Miss. 2007).  Once the moving party waives a ruling on his motion, he is procedurally barred from raising the issue on appeal. *Ross v. State*, 954 So. 2d 968, 992 (Miss. 2007).  The trial judge only said, "[W]e'll wait and see."  There is no indication that Stevens raised the motion again.  Instead, when it came time for the sentencing phase, his counsel asked that the trial be delayed until after lunch, which the court agreed to do.  It seems that the Mississippi Supreme Court's decision that the issue was barred from review was correct.

Stevens argues here that the procedural bar should not apply because the Mississippi Supreme Court "wrote at length on the merits of Petitioner's issue in his direct appeal . . . ."  That is factually inaccurate.  The court discussed the procedural bar for two paragraphs, then stated, "The trial court conducted a separate sentencing hearing as soon as practicable as required in Miss. Code Ann. § 99-19-101(1)."  To the extent that there was a discussion on the merits, that was it.  Stevens also argues that he has established cause for the default, stating, "It was lunchtime and the jury, attorneys, and judge were hungry and exhausted after having finished a capital trial involving four counts of capital murder and a fifth count of aggravated assault."  He cites no authority establishing this a legal cause for default, likely because there is none.  It is well-established that attorney error short of ineffective assistance of counsel does not constitute cause that will excuse procedural default. *McCleskey v. Zant*, 499 U.S. 467, 494 (1991); *Cotton v. Cockrell*, 343 F.3d 746, 754 (5th

Cir. 2003).  Likewise, perceived futility in pressing an objection in the trial court will not constitute

cause.  *Engle v. Isaac*, 456 U.S. 107, 130 (1982).

Even if Stevens could establish cause for the default, such as ineffective assistance of

counsel, he must still establish that he was prejudiced by the alleged error.  *Murray v. Carrier*, 477

U.S. 478, 494 (1986).  For purposes of overcoming a procedural default, prejudice is evaluated in

the context of the particular case.  *Wainwright v. Sykes*, 433 U.S. 72, 91 (1977) (holding that other

evidence of guilt negated any possibility of prejudice from admission of an inculpatory statement).

Here, the record does not support Stevens's claim that the judge, jury, and attorneys were too

exhausted to proceed with his case – a contention that is based upon speculation and not evidence.

The record shows that, on the Thursday evening before the guilty verdict was returned, the

judge and the attorneys discussed the possibility of continuing past 6:30 p.m. or excusing the jury

for the day.  Defense counsel stated, "I am tired, but I could go forward with it."  He also stated that

he would be willing to continue, so long as the jury would assure the court that they would be patient

with the testimony.  The judge asked the jury to decide whether they could go on past 7:00 or

whether they would prefer to recess and come back in the morning.  The jury left the courtroom to

deliberate on that question.  During the discussion with counsel while the jury was out, the trial judge

commented that he considered the penalty phase part of the trial more important than the guilt phase

and noted that he wanted to give the jury ample time to consider the evidence in that phase.

Ultimately, a bailiff informed the judge that one or two jurors wanted to retire for the evening, and

the judge declared a recess until the next day.

The next day, Friday, the jury heard closing arguments and retired to deliberate at 9:39 a.m.

The jurors returned with a verdict at 11:25.  The penalty trial began at 1:00 that afternoon, and the

jury heard evidence until 5:44 p.m., when court was recessed for the evening.  The trial re-convened at 9:00 a.m. on Saturday, and the jury began deliberating at 10:37 a.m.  At 11:05 a.m., the jury asked, "If the death penalty is rendered on one or more counts and life imprisonment with or without parole is rendered on one or more counts, how are the sentences served?"  After consulting counsel, the court advised the jury that it could not answer that question.  At 1:30 p.m., the jury returned with its verdict imposing the death penalty.

A review of these events shows that the trial judge, while he may have expressed impatience and a desire to hurry during some portions of the trial, wanted to give the jury ample time to consider the appropriate sentence.  The jurors were released at 6:30 p.m. on Thursday and at 5:44 p.m. on Friday, which does not indicate that they were overworked by the court.  Defense counsel stated on Thursday that he could continue, and the record indicates that both the judge and the prosecutor wished to do so.  There is no evidence, either in the form of statements in the record or affidavits from the participants, that the jury was incapable of considering the evidence presented at sentencing.  There is also no contention that the  defense was unable to acquire or present mitigating evidence due to the short recess between the guilt and sentencing phases.

Finally, the evidence presented during the sentencing phase lasted less than five hours.  The jury deliberated on the sentence for roughly three hours, which was an hour longer than it deliberated on guilt.  By sending a question from the jury room, the jurors demonstrated that they were carefully deliberating on the appropriate sentence.  All of these facts negate the claim that Stevens was prejudiced by his attorneys' failure to re-urge a three-day delay between the bifurcated proceedings.

Finally, even if the procedural bar were overcome, the issue becomes whether the state court's opinion offends 28 U.S.C. §2254, which precludes habeas relief on any claim adjudicated

on the merits unless it resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law.  Stevens claims that the failure to delay the sentencing phase of the trial denied his Fifth and Fourteenth Amendment guarantees to due process, his Sixth Amendment right to effective counsel, and his Eighth Amendment right to have the jury consider all the evidence.  He has cited no cases in which the Supreme Court has ruled differently than the Mississippi Supreme Court on the same legal issues or on a set of materially indistinguishable facts. He argues, however, that the relevant federal law can be gleaned from "a series of precedents [establishing] the governing legal principle or principles."  *Lockyer v. Andrade*, 538 U.S. 63, 71 (2003).

Perhaps the most analogous cases are those involving claims of jury coercion, which have been considered on numerous occasions by the United States Supreme Court.  Such claims have been considered in the context of what the record shows about the jury's deliberations.  *Lowenfield v. Phelps*, 484 U.S. 231, 236 (1988); *see also Montoya v. Scott*, 65 F.3d 405 (5th Cir. 1995) (holding that giving an *Allen (Allen v. United States*, 164 U.S. 492, 501 (1896)) charge must have been, under the circumstances of the trial "so coercive as to have unconstitutionally rendered the petitioner's trial fundamentally unfair.")  The analysis is the same even in a death penalty case.  *Lowenfield*, 484 U.S. at 238.  Where the record does not show that the trial court's actions, or the circumstances in which the jury was compelled to deliberate, improperly influenced the jury's verdict, there is no constitutional violation, either under the Due Process Clause or the Eighth Amendment.  *Id*.

In the context of the Sixth Amendment, the Supreme Court has held that it was not unconstitutional for a trial court to deny a request for continuance made at the beginning of trial by the defendant, who had recently been appointed a new attorney.  "Not every restriction on counsel's

time or opportunity to investigate or to consult with his client or otherwise to prepare for trial violates a defendant's Sixth Amendment right to counsel." *Morris v. Slappy*, 461 U.S. 1, 11 (1983). Again, that analysis turned on the specific facts of that case, which indicated that the petitioner had not been prejudiced by being compelled to go forward. The Fifth Circuit has reached the same result, holding that a state court did not violate a petitioner's constitutional right to counsel by requiring him to proceed on the sentencing part of his trial on the same day as the guilty verdict was returned, despite his attorney's claim that she was unprepared. Citing *Morris v. Slappy*, the court reasoned:

> The circumstances here are even less problematic, primarily because Orr was chief counsel throughout the guilt phase of the trial. She was intimately acquainted with Mosley and the facts of the case. She had heard all of the testimony and had an opportunity to observe the jury. That Orr had been warned that the penalty phase would begin after the resolution of the guilt phase, and chose to ignore that warning, does not rise to the level of ineffective assistance of counsel.

*Mosley v. Dretke*, 370 F.3d 467, 473 (5th Cir. 2004).

Based on these cases, even if the procedural bar was not applied and the decision of the Mississippi Supreme Court was considered as a ruling on the merits, habeas review would not offer Stevens relief. The trial court's action in denying a three-day break between the proceedings must be considered in the context of the facts of this case. When it is, the Mississippi Supreme Court's affirmance is neither contrary to nor an unreasonable application of clearly established federal law. Therefore, this argument has no merit.

**Ground I:**  **The Prosecutor made inflammatory remarks to the jury in violation of Petitioner's Fifth and Fourteenth Amendment rights under the United States Constitution.**

The specific remarks alleged by Stevens to be improper came during the opening statement at the penalty phase, as follows:

(1)  "I told you at one point in this trial, if we got there, I would ask you to kill Benny Joe Stevens."

(2)  "I've been at this for thirty years, and I've talked to jurors after trials like this."

(3)  "But I've learned after all these years that holding up a lot of photographs or bloody pictures, screaming, yelling works sometimes with certain juries, but I don't think you're that type of jury."

(4)  "[A]nd I thought I'd seen a lot in my thirty years . . . ."

There was no objection from the defense until the last statement, when one of Stevens's attorneys interposed an objection "to his commenting, using his experience to compare the case severity of the case."  Before the trial judge ruled, the prosecutor went on, "Forget all my other cases."  When he completed his argument, defense counsel asked to approach the bench, and the following colloquy occurred:

MR. SWEATT:  We objected to what was like a comment on using his experience to say this is the worst case –

MR. BURDICK:  I didn't say that.

MR. SWEATT:  And the Court didn't rule.

THE COURT:  I thought he changed it.

MR. BURDICK: I did.  I said forget about all the experience.

THE COURT:  That's what I thought he said.

MR. SWEATT:   It's overruled.

THE COURT:   Yeah.

In its opinion on direct appeal, the Mississippi Supreme Court noted the wide latitude traditionally afforded to counsel in argument and held that, particularly in light of the facts of this case, it was not likely that the prosecutor's remarks had prejudiced the jury. *Stevens*, 806 So. 2d at 1057.  Similar remarks have been permitted in other cases, and the remarks made by the prosecutor in Stevens's case were "within limits of proper debate."  *Id*.  As the court stated, "Exaggerated statements and hasty observations are often made in the heat of the day, which, although not legitimate, are generally disregarded by the court, because in its opinion, they are harmless."  *Id*. At 1058.

In his habeas argument on this issue, Stevens has cited to several United States Supreme Court cases that were direct appeals of federal prosecutions.  Those cases are inapposite, as the Court, in that situation, exercises its supervisory powers rather than determines constitutional issues.  *See Lowenfield*, 484 U.S. at 552 n.3 (noting that the holdings in such decisions need not be followed on habeas review).  Where a statement made by the prosecutor during argument is challenged by way of collateral review, the appropriate standard of review is not whether the comment was improper or worthy of condemnation, but whether it "so infected the trial with unfairness as to make the resulting conviction a denial of due process."  *Donnelly v. DeChristoforo*, 416 U.S. at 643.  In that review, the court must consider that the remark "is but one of several components of the trial which may result in the judgment of conviction."  *Id*. at 645.  In *Darden v. Wainwright*, 477 U.S. 168 (1986), the Court was presented with several statements made by the prosecutor during closing argument that allegedly mandated reversal:

As far as I am concerned, there should be another Defendant in the courtroom, one more, and that is the division of corrections, the prisons . . . . Can't we expect him to stay in a prison when they go there?

I will ask you to advise the Court to give him death.  That's the only way that I know that he is not going to get out on the public.  It's the only way I know.  It's the only way I can be sure of it.  It's the only way that anybody can be sure of it now, because the people that turned him loose.

As far as I am concerned, and as Mr. Maloney said as he identified this man this person, as an animal, this animal was on the public for one reason.

He shouldn't be out of his cell unless he has a leash on him and a prison guard at the other end of that leash. . . . I wish [one of the victims] had had a shotgun in his hand when he walked in the back door and blown his [the defendant's] head off.  I wish that I could see him sitting here with no face, blown away by a shotgun. . . . I wish someone had walked in the back door and blown his head off at that point. . . . He fired in the boy's back, number five, saving one.  Didn't get a chance to use it.  I wish he had used it on himself.  I wish he had been killed in the [subsequent auto] accident, but he wasn't.  Again, we are unlucky that time.

Only after the last comment did defense counsel object to the argument.  477 U.S. at 181 nn.9, 10, 11 & 12.  The Court affirmed the conviction in that case, noting that the trial court instructed the jurors that the comments of counsel were not evidence.  Additionally, two victims of the crime survived and gave eyewitness testimony identifying the defendant as the assailant, another witness described his car, and, after the car was later involved in an accident, a gun with a misfired shell in the chamber was found near the scene, later described as the same type of gun that killed the third victim.  This "overwhelming evidence," in the Court's opinion, made it unlikely that the jury's verdict was influenced by this argument, however ill-advised.  *Id*. at 182.  *See also Ward v. Whitley*, 21 F.3d 1355, 1365 (5th Cir. 1994) ('The argument that Ward was a bad person deserving of death . . . pales beside the other evidence of his bad character . . . .")

This is the same result reached by the Mississippi Supreme Court after an analysis of state law, as well as the overwhelming evidence against Stevens, holding that the argument was not prejudicial.  The court also recognized that Stevens did not ask the trial court for a curative instruction, an admonishment, a mistrial, or a new jury.  While the decision did not rely on federal authority, the outcome would have been the same if federal precedent had been reviewed.  There is no basis for habeas relief on this issue.

**Ground J:**  **Benny Joe Stevens was denied his Fifth, Sixth and Fourteenth Amendment rights guaranteed by the United States Constitution when the trial court erroneously limited Mr. Stevens's counsel on *voir dire* during his attempt to rehabilitate two jurors that expressed doubts about applying the death penalty.**

This argument relates to the questioning of two jurors – Mary A. Williamson and Melville L. Cordua.  Stevens argues that the trial court prevented him from rehabilitating either of these jurors after they expressed doubts about applying the death penalty.  The questioning began with the following inquiry from the trial judge, "Are there any of you that have any firm opinions about . . . the death penalty either way, either for or against, where those opinions might keep you from following the law and following these instructions and following the evidence in this case?" Melville Cordua responded that he was "opposed to the death penalty, and I don't think I could bring myself to render or give the death penalty to somebody, your Honor."  The judge then asked whether his opinion "would substantially impair or prevent you from following out your instructions and duties as a juror?"  Cordua replied, "I believe so, Your Honor."  Later, during questioning from the prosecutor, the row of jurors on which Cordua was sitting was asked whether anyone on the row could not impose the death penalty.  The prosecutor asked Cordua the question directly, and the

record indicates that he nodded his head affirmatively.  Stevens argues that his attorney was not

permitted to rehabilitate Cordua; the exchange between counsel and Cordua was as follows:

Q.      Mr. Cordua, I'd ask you, you said you were opposed to the death penalty.
        Number 39.

A.      JUROR MELVILLE L. CORDUA: Yes, I am.

Q.      Are there any circumstances that you would impose the death penalty?

A.      I'm sorry, I don't think I could put somebody to death or kill somebody like
        the District Attorney said.

Q.      What if it were circumstances like a person who was convicted of a crime
        already and he was in prison when he killed another?

MR. BURDICK: We object to that.  That's not the facts of this case.

THE COURT: I think he's answered the question, Mr. Sweatt.  I
believe he did.  He said he couldn't imagine any circumstances.
Yeah, I think he's give his answer.

MR. SWEATT: Your Honor, if you have sustained the objection,
then we would object because we think we're allowed to rehabilitate
jurors.

THE COURT: You are.  But he's already given you the answer, is
what I'm saying.

MR. SWEATT: I didn't hear it.

THE COURT: He said he could not envision any circumstances.

MR. SWEATT: I'm merely trying to help him see if there are any that
he could envision, Your Honor.  And I think I'm entitled to do that.

THE COURT: Well, I think you asked him, and he can't envision
any.

MR. SWEATT: Thank you.  You can sit down, sir.

59

After the original question was posed by the court, Mary Williamson stated, "I couldn't vote for the death penalty."  When the judge asked if she could vote for it under any circumstances, she shook her head negatively.  The judge went further, "Even if you were instructed otherwise by the Court."  The record indicates that she nodded her head affirmatively.  Later, during the prosecution's questioning, she repeated that she could not inflict the death penalty on Stevens, under any facts or circumstances.  She was then asked, "Would the fact that the death penalty is involved affect your ability to fairly apply the law in this case?"  She answered, "Probably, because I don't believe in it."  When defense counsel attempted to rehabilitate Williamson, the following colloquy occurred:

> Q.    Mrs. Williamson, number 76, you have several children and you said you could not impose the death penalty under any circumstance.  But I'd ask you if the victims were two of your children, do you think you'd change your mind?
>
> A.    If it would bring them back, yeah.
>
> Q.    Even if it were somebody close to you.
>
> A.    I still wouldn't do it.
>
> Q.    You still wouldn't do it?
>
> A.    No, sir.
>
> MR. BURDICK: Judge, I think I have an objection.
>
> THE COURT: You may need to stand up so that the court reporter can at least see you.
>
> MR. BURDICK: Judge, my objection is bringing up hypothetical based on their personal experience.  I don't think that's – that's not fair and objective.

> THE COURT: All right.  I think she's given her answer, though.  If you'll repeat your answer.  The question was, if it happened to your children, would that give –

A.  JUROR MARY WILLIAMSON: If it would bring them back, I would.

> THE COURT: That's what I thought you said.  Okay.  You may have a seat.

Stevens argues that the trial court's rulings "amounted to a refusal to allow the defense to adequately question the venire during voir dire on the subject of whether they would automatically impose the death penalty or whether there were certain situations where they may change their mind and vote to inflict the death penalty."  On appeal, the Mississippi Supreme Court addressed the questioning of Williamson and Cordua (a third juror was discussed on appeal, but not on habeas).  The court began with the Supreme Court's pronouncement in *Witherspoon v. Illinois*, 391 U.S. 510, 515 (1968),  "Unless a venireman states unambiguously that he would automatically vote against the imposition of capital punishment no matter what the trial might reveal, it simply cannot be assumed that that is his position."  *Stevens*, 806 So. 2d at 1061.  Then the court analyzed the issue  under state law, recognizing that voir dire should be conducted under the supervision of the trial judge, using his sound discretion, where a prospective juror professes difficulty with the death penalty, "[T]he court should inquire further whether the juror would follow its instructions and a fair verdict render according to the law and the evidence."  806 So. 2d at 1062 (quoting *Hansen v. State*, 592 So. 2d 114, 128 (Miss. 1991)).  The test for removal is whether the juror's position on the death penalty "would prevent or substantially impair the performance of his duties in accordance with his instruction and his oath" so that the court believes that the juror "would be unable to faithfully and impartially apply the law."  806 So. 2d at 1062 (quoting *Wainwright v. Witt*, 469 U.S. 412 (1985)).

61

The court concluded that the record in this case indicated that Stevens was given an opportunity to conduct voir dire on any relevant issue and was not prevented from rehabilitating jurors.

The Mississippi Supreme Court properly began its analysis with *Witherspoon*, where the Court held that a trial court could properly exclude jurors who made it unmistakably clear "(1) that they would automatically vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before them or (2) that their attitude toward the death penalty would prevent them from making an impartial decision as to the defendant's guilt." 391 U.S. at 522 n.21. Realizing that this language, particularly the requirement that a juror must make it "unmistakably clear" that he would "automatically" vote against the death penalty, was too restrictive, the Court later changed the standard. *Wainwright v. Witt*, 469 U.S. 412 (1985). The standard became as whether the juror's views "would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and oath." *Id*. at 433 (quoting *Adams v. Texas*, 448 U.S. 38, 45 (1980)).

As on other issues, Stevens has cited several cases involving federal criminal prosecutions as instructive of the manner in which voir dire should have proceeded at his trial; however, federal habeas review of a claim of juror bias is more narrowly circumscribed than appellate review in a federal criminal prosecution. *Smith v. Phillips*, 455 U.S. 209, 218 (1982). Stevens does, however, correctly argue that he had the right to ask questions reasonably necessary to expose juror bias. *Turner v. Murray*, 476 U.S. 28, 36 (1986); *Burns v. Estelle*, 592 F.2d 1297, 1301 (5th Cir. 1979). His citation to *Burns* does not help his argument. While *Burns* reversed a conviction for failure to permit defense counsel to further voir dire a juror with scruples against the death penalty, the case was decided under the restrictive *Witherspoon* standard, stating "Only the most extreme and compelling

62

prejudice against the death penalty, perhaps only or very nearly a resolve to vote against it blindly and in all circumstances, is cause to exclude a juror on Witherspoon grounds." *Id*. at 1300. Under current standards, even though defense counsel should be permitted to further develop a juror's position by relevant questioning, "[T]he trial judge retains discretion as to the form and the number of questions on the subject . . . ." *Turner*, 476 U.S. at 37.

As stated above, a juror with qualms about the death penalty should not be excused if further voir dire establishes that his views would not prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and oath. Thus, where a juror states, generally, that his views on the death penalty would not prevent him from imposing it in certain situations, he is qualified to serve. *See, e.g., Miller-El v. Dretke*, 545 U.S. 231, 250 n.10 (2005). However, more specific statements from the juror become problematic. Where the juror states that he might consider the death penalty, but only under a set of facts that do not exist in the case he will be sworn to consider, he should be excluded as biased. *Riles v. McCotter*, 799 F.2d 947, 950 (5th Cir. 1986); *Monroe v. Blackburn*, 748 F.2d 958, 961 (5th Cir. 1984). In *Monroe*, the defendant was convicted of murder based on eyewitness testimony. The Fifth Circuit refused to find error in the exclusion of a juror who stated during voir dire that he would consider the imposition of the death penalty *only* if the defendant confessed to the crime, finding that position "to be equivalent to the position that he would not consider the death penalty under any circumstances." *Id*.

Here, both Cordua and Williamson stated that they could not impose the death penalty. Cordua indicated on three separate occasions that he was opposed to the death penalty; when he was asked whether his opinion would substantially impair or prevent him from performing his duties as a juror, he said, "I believe so." In an attempt to rehabilitate him, defense counsel asked whether he

63

could impose it under any circumstances, and he said, "I'm sorry, I don't think I could put somebody to death or kill somebody like the District Attorney said." Then, defense counsel asked, "What if it were circumstances like a person who was convicted of a crime already and he was in prison when he killed another?" This was not the fact situation that would be presented in Stevens's trial; even if Cordua had answered "yes" to this question, that answer would not have qualified him to serve.

The problem is that the trial judge cut off further questioning after that. Some of Cordua's earlier answers were not absolutely unequivocal. He "didn't think" he could render the death penalty; he "believed" his opinion would prevent him from performing his duties as a juror. Likely, defense counsel hoped to work back from the given circumstance to a general concession that there were circumstances under which Cordua could consider the death penalty. The record also shows, however, that Cordua unequivocally stated on two other occasions that he was opposed to the death penalty, and, at another point during voir dire, said he could not impose it. Given these answers, and the trial court's discretion to supervise voir dire, it does not appear that the Mississippi Supreme Court's opinion with regard to Cordua was contrary to or an unreasonable application of federal law.

With regard to Williamson, the record is clearer. She stated affirmatively on several occasions that she couldn't vote for the death penalty under any circumstances, even if instructed by the court to consider it. When asked whether the possibility of the death penalty would affect her ability to fairly apply the law, she replied, "Probably, because I don't believe in it." Defense counsel attempted to rehabilitate her by asking whether she could consider the death penalty if the victims were her children, and she responded "If it would bring them back, yeah." Counsel followed up by asking, "Even if it were somebody close to you?" She replied twice that she still wouldn't do it.

In Williamson's case, the defense also asked a hypothetical irrelevant to the case at hand, probably in the hope that an affirmative answer could lead to a more general concession regarding the death penalty.  Not only was the question irrelevant, but Williamson's answer was not affirmative.  She answered that, even if her children had been killed, she would not consider the death penalty unless it would bring them back.  Aside from the fact that she would have been ineligible to serve as a juror in that case, imposing the death penalty obviously would not achieve that result.  Moreover, when the defense continued that line of questioning, Williamson confirmed that she would not return a verdict of death even where the victim was close to her.  The trial judge acted within his discretion in terminating the questioning, and the Mississippi Supreme Court's affirmance on this issue is not subject to habeas review.

**Ground K:**  **The trial court denied Petitioner his Fifth, Sixth, Eighth and Fourteenth Amendment rights, as set forth in the United States Constitution, by erroneously denying Petitioner's motion for individual sequestered voir dire, which is designed to effectively expose any prejudice among potential jurors and to ensure justice in such a sensitive case.**

Prior to trial, Stevens's attorneys moved for individual sequestered voir dire, to be assured of more frank responses to questions, to avoid the inadvertent exposure of the entire venire to prejudicial information and to prevent the jurors from learning the responses that would excuse them from jury service.  The motion was heard by the trial court in a pretrial hearing.  The prosecutor suggested bringing twelve jurors in at a time for voir dire, but the judge made the following ruling:

> Well, we've been pretty successful about keeping them all in the Courtroom and doing them all as a group.  I think that Judge Prichard has used questionnaires to – to limit a lot of problems, and a lot of questions, and then I allow kind of a hybrid system.  You'd ask all the questions to the entire panel, and then when you get down to maybe some particular questions that you may run into these problems, then you may be able to do them in groups – smaller groups if it's necessary, but most of the

time I've found it's been – it's worked pretty well the way we've done it in the past, and I'll probably stay with that procedure . . . . which does not involve, you know, individual voir dire.

On direct appeal, the Mississippi Supreme Court considered this issue and made the following findings:

> The trial court in the case sub judice allowed the jurors to approach the bench if they did not wish to answer a question in front of the venire panel. The trial court explained to the venire panel that if the jurors did not raise their hands when asked a question, then it will be assumed that the juror's answer is the one that was expected from the way the question was phrased.
>
> The trial court also used a juror information questionnaire previously used by the trial court in a capital murder case. The questionnaire covered various topics including educational background, employment background, relationships, criminal background of family members or a close friend, religious affiliation, involvement in legal actions, prior jury service, organization membership, television programs regularly viewed, marital status, hobbies, children's ages and occupations. The trial court's questionnaire covered some of the embarrassing questions normally posed to a jury panel on voir dire. . . .
>
> If an attorney ran into problems on voir dire, the trial court stated that it would allow smaller groups of jurors to be voir dired if necessary to address particular concerns

*Stevens*, 806 So. 2d at 1054. Finding that, under Mississippi law, the decision of whether to conduct individual, sequestered voir dire is left to the discretion of the trial judge, the court affirmed on this issue.

Stevens argues that, given that his was a death penalty case, constitutional considerations mandated individual sequestered voir dire in his case. He does not cite a Supreme Court case that requires individual voir dire, even in a capital case, but he does cite to opinions involving appeals of federal criminal cases that indicate that it is desirable. The Fifth Circuit has refused to mandate sequestered voir dire in federal criminal cases, stating, "The decision to permit individual

questioning lies within the district court's discretion, and we will find an abuse of that discretion only 'when there is insufficient questioning to allow defense counsel to exercise a reasonably knowledgeable challenge to unqualified jurors.'" *United States v. Bieganowski*, 313 F.3d 264, 272-73 (5th Cir. 2002) (quoting *United States v. Beckner*, 69 F.3d 1290, 1291 (5th Cir. 1995)).

In any event, Stevens's arguments seem to be foreclosed by the opinion in *Mu'Min v. Virginia*, 500 U.S. 415 (1991). *Mu-Min* was a habeas case where the petitioner asked the Court to determine whether the state court judge erred by refusing to ask jurors who indicated that they had been exposed to pretrial information about the case the exact content of that information. As a preliminary matter, the Court noted, "We enjoy more latitude in setting standards for *voir dire* in federal courts under our supervisory power than we have in interpreting the provisions of the Fourteenth Amendment with respect to *voir dire* in state courts." *Id.* at 424. Thus, the Court reasoned, even though the standards suggested by the American Bar Association would require individual voir dire about the content of pretrial information, "[t]he fact that a particular rule may be thought to be the 'better' view does not mean that it is incorporated into the Fourteenth Amendment." 500 U.S. at 430-31 (citing *Cupp v. Naughten*, 414 U.S. 141 (1973)).

Ultimately, the Court rejected the petitioner's argument, noting that an interrogation about the content of each juror's pretrial knowledge would require individual voir dire. "The trial court in this case expressed reservations about interrogating jurors individually because it might make the jurors feel that they themselves were on trial. While concern for the feelings and sensibilities of potential jurors cannot be allowed to defeat inquiry necessary to protect a constitutional right, we do not believe that "content" questions are constitutionally required." 500 U.S. at 425. Based on the

traditional deference accorded to trial judges in the manner in which they conduct voir dire, the Court held that the Constitution did not require more than was done.

The State argues that *Mu'Min* stands for the proposition that individual voir dire is not constitutionally required. The case does not expressly state that; however, the Court's disinclination to set out particular procedures that must be followed by state court judges during voir dire is clear. The inference in *Mu'Min* is that a decision not to allow sequestered voir dire in state court will not ordinarily be disturbed on habeas review. Based on that inference, and in the absence of any clear federal precedent supporting Stevens's argument, it cannot be held that the Mississippi Supreme Court's decision was contrary to or and unreasonable application of federal law.

**Ground L:**     **Petitioner was denied his Fifth, Sixth, Eighth, and Fourteenth Amendment rights guaranteed by the United States Constitution when the trial court improperly denied Petitioner's Motion for a Directed Verdict and Motion for a New Trial or in the Alternative a Judgment non Obstante Veredicto because the verdicts of the jury were against the overwhelming weight and sufficiency of the evidence.**

Stevens argues here that there was insufficient evidence to support the statutory aggravating circumstance, found by the jury to exist beyond a reasonable doubt, that the murders were especially heinous, atrocious or cruel. In support of that argument, he states that all four of his victims "died of a single shotgun blast to the head." He argues that each death was instantaneous, that the four victims died within seconds or minutes of each other and that no victim lingered.

At the conclusion of the evidence in the sentencing phase, the jury was instructed:

> The Court instructs the jury that in considering whether the capital offense was especially heinous, atrocious or cruel; heinous means extremely wicked or shockingly evil; atrocious means outrageously wicked and vile; and cruel means

designed to inflict a high degree of pain with indifference to, or even enjoyment of the suffering of others.

An especially heinous, atrocious or cruel capital offense is one accompanied by such additional acts as to set the crime apart from the norm of capital murders – the conscienceless or pitiless crime which is unnecessarily torturous to the victim. If you find from the evidence beyond a reasonable doubt that the defendant utilized a method of killing which caused serious mutilation, that there was dismemberment of the body prior to death, that the defendant inflicted physical or mental pain before death, that there was mental torture and aggravation before death, or that a lingering or torturous death was suffered by the victim, then you may find this aggravating circumstance exists.

The Mississippi Supreme Court made the following findings on this issue in its opinion on direct appeal:

We find that there is ample evidence presented to establish that the crimes committed by Stevens fit squarely within the limiting definition of heinous, atrocious and cruel provided in the jury instruction given by the trial court. Wesley was shot four times with two different guns. Wesley called out for help and asking [sic] God for help. Glenda pleaded for her children's safety before being shot in the head. Two young boys, Heath and Dylan, were both brutally murdered. Heath, age [sic] twelve, was shot twice, the first shot to the face with the second fatal shot to the chest severing his spine. Dylan was age eleven when he died. Erica, Stevens's daughter, was shot in the back, but she managed to escape the massacre. Erica testified that Stevens told her mother, Glenda, before he killed his ex-wife that "[B]itch, I told you I would kill you one of these days." Stevens confessed to his wife, Lauren, that he had "just killed a family." Not only were acts of murder brutal, each family member and Heath were hunted down and forced to endure each person's murder one by one. Obviously, the jury was presented sufficient evidence to support the finding.

*Stevens*, 806 So. 2d at 1060. On post-conviction, the issue was presented again, and the court ruled that it was barred from reconsideration. Alternatively, the court repeated the findings listed above and ruled that the argument had no merit. *Stevens*, 867 So. 2d at 224.

Stevens does not complain that the instruction failed to appropriately limit his eligibility for the death penalty; he argues that the evidence does not satisfy the elements of the instruction. As

the Mississippi Supreme Court recognized, the record does not support Stevens's argument. Erica's testimony, the condition of the bodies, and the ballistics evidence show that Wesley was shot first and lived for some time, crying out for help. Erica, who survived the attack, was apparently shot next. Either Dylan or Glenda was shot just after Erica, and each of them died from a single shot. Glenda saw that her daughter had been wounded and had time to grab her own weapon and to call out to Stevens before she was shot. Heath was shot twice, and he was in a defensive position when he was shot the second time. Wesley was ultimately shot four times. During this time, Erica managed to crawl out of a bathroom window, hide under the trailer for some period of time, then run down the road to a neighbor's house, still hearing shots.

"Our review of these findings [on aggravating circumstances] is limited to the question whether they are so unprincipled or arbitrary as to somehow violate the United States Constitution." *Barclay v. Florida*, 463 U.S. 939, 947 (1983). In *Godfrey v. Georgia*, 446 U.S. 420 (1980), cited by Stevens in support of his argument, the defendant shot his wife through a trailer window, killing her instantly. Then he entered the trailer, struck his daughter with the barrel of his gun, and fired the gun at his mother-in-law, killing her instantly, as well. 446 U.S. at 425. Godfrey was sentenced to death, on the basis that the crime satisfied the aggravating circumstance of being "outrageously or wantonly vile, horrible or inhuman . . . [involving] depravity of mind . . . ." The Court reversed, holding that it could not determine, from the facts of the case, whether the Georgia Supreme Court had applied a constitutional construction of that aggravating circumstance. 446 U.S. at 433. The basis of that holding, however, was not that the evidence was constitutionally insufficient; later opinions have made clear that application of a narrowing construction of that aggravator by the Georgia court would have resulted in affirmance. *Lambrix v. Singletary*, 520 U.S. 518, 531 (1997).

Cases following *Godfrey* have held that the federal court's role in reviewing a state court's finding of an aggravating circumstance is primarily a review of whether the aggravator itself is constitutionally defined. *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990). Beyond that, habeas review "is limited, at most, to determining whether the state court's finding was so arbitrary or capricious as to constitute an independent due process or Eighth Amendment violation." *Id*. That review is conducted under the familiar rationale of *Jackson v. Virginia*, 443 U.S. 307 (1979). The relevant question is, "[W]hether, after viewing the evidence and the reasonable inferences which flow therefrom in the light most favorable to the verdict, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." 443 U.S. at 324. As the United States Supreme Court has explained, "Federal Courts are not forums in which to relitigate state trials." *Autry v. Estelle*, 464 U.S. 1, 3 (1983).

A state court's finding that a murder was "especially heinous," made either by a jury or a state appellate court that has independently reviewed the evidence, is arbitrary and capricious "if and only if no reasonable sentencer could have so concluded." *Lewis*, 497 U.S. at 783. In *Lewis*, the defendant had strangled his victim after she became unconscious from a heroin overdose. When he determined that she was dead, he struck her head several times, calling her a "bitch" and a "dirty snitch." The Supreme Court held that the state court "could reasonably have concluded" that the crime was especially heinous or committed in a depraved manner. *Id*. Likewise, here, the shootings took place over some period of time, with the first victim apparently living through most or all of the other killings. Wesley was shot four times; the fourth shot, and, possibly, the third, were gratuitous, as the second shot was lethal. Before he shot Glenda, Stevens said, "Bitch, I told you that I'd kill you one of these days." The children witnessed the other shootings before they were killed,

71

and one of the children was shot once before he was killed.  The jury's finding that these facts

satisfied the statutory aggravator were not arbitrary or capricious.

**Ground M:** **The trial court denied Mr. Stevens's Fifth and Fourteenth Amendment due process rights as set forth in the United States Constitution in that counsel was appointed to represent him at the state post-conviction collateral relief stage of his case, as is his right according to Mississippi state law, but the representation, owing to systemic and other flaws, was so extremely deficient that Mr. Stevens was denied the possibility of meaningful relief in violation of his right to due process as guaranteed by the Federal Constitution.**

Stevens raises this claim, not to overcome a procedural bar or to support a claim of

ineffectiveness, but as a free-standing due process claim.  He argues that the State of Mississippi,

through its opinion in *Jackson v. State*, 732 So. 2d 187 (Miss. 1999), established a right to post-

conviction representation for inmates sentenced to death.  Having established that right, the State

was obligated to provide it consonant with the federal constitutional requirement of due process.

Stevens contends that the state agency established to provide post-conviction counsel was

inadequate, due to funding and personnel problems, and that the situation was exacerbated by

interference from the Office of the Attorney General.   Those problems precluded adequate

representation, which Stevens asserts violated his due process rights.   Stevens's argument was

summarized in his rebuttal brief, as follows:

> Said again, Stevens does not claim he was provided ineffective assistance of post-conviction counsel, Stevens claims that he did not receive post-conviction counsel, which is a right provided by state constitutional, common and statutory law. The Petitioner goes further by averring that the denial of this right was due in substantial part to State action, i.e., by the Chief Justice of the Supreme Court of the State of Mississippi acting in his administrative role, **and** by the Office of the Attorney General of the State of Mississippi acting in an extra-judicial setting, that is, by its meddling in the affairs of the Mississippi Office of Capital Post-Conviction Counsel and elsewhere.

Stevens's claim arises from the troubled history of the Mississippi Office of Capital Post-Conviction Counsel.  Prior to 2000, the State of Mississippi relied on volunteer counsel and the federally funded Capital Defense Resource Center to provide assistance to death penalty litigants in collateral proceedings.  After Congress stopped funding the resource centers in 1995, the issue of providing representation to defendants in the post-conviction phase of capital cases became particularly acute.  In 1999, the Mississippi Supreme Court described the system for appointing and compensating counsel in such cases as "flawed." *Jackson v. State*, 732 So. 2d 187, 188 (Miss. 1999).  Although collateral proceedings in criminal cases are actually civil in nature, the court found that post-conviction efforts "have become an appendage, or part, of the death penalty appeal process at the state level." *Id*. at 190.  This has occurred both because  ineffectiveness of counsel cannot usually be raised prior to that time and because death penalty litigation has become "specialized, complex and time consuming . . . ." *Id*.  Given an inmate's limited ability to investigate his claims, as well as the likelihood that he does not comprehend the intricacies of post-conviction litigation, the court found that the denial of counsel and appropriate funding effectively denied him meaningful access to the courts.  Thus, the court granted Jackson's request for the appointment of counsel and litigation expenses, expressly finding that "in capital cases, state post-conviction efforts, though collateral, **have become part of the death penalty appeal process at the state level.**" (Emphasis added). *Id*. at 191.

In 2000, the Mississippi Legislature responded to the court's request that it address this issue by creating the Office of Capital Post-Conviction Counsel.  Miss. Code Ann. §§ 99-39-101 through -119 (Supp. 2006).  The Office is to consist of three attorneys, all of whom devote their professional

duties to representation of capital defendants engaged in collateral proceedings. § 99-39-107.  Each

of these attorneys is to "meet all qualifications necessary to serve as post-conviction counsel for

persons under a sentence of death." § 99-39-103.  At the same time, the limitations period for filing

motions for post-conviction relief in death penalty cases was shortened from three years to one year.

Miss. Code Ann. § 99-39-5(2) (Supp. 2006).

Creation of this Office also permitted the State to claim that it had complied with the "opt-in"

requirements of 28 U.S.C. §§ 2261-66 (1996), which provide certain benefits to states that comply

with its terms, including the following:

> 1) the general one-year statute of limitations is reduced to six months;
>
> 2) federal district courts are limited to considering only claims that have been raised and decided on the merits in the State courts; and
>
> 3) the district court must render a decision on a habeas petition within 450 days of filing or 60 days of submission.

In order to claim these benefits, the State must have established " a mechanism for the appointment,

compensation, and payment of reasonable litigation expenses of competent counsel" in post-

conviction proceedings for indigent prisoners under a sentence of death.  § 2261(b).[1]  To insure

competency, the State must establish standards for attorneys so appointed.  Mississippi has done so

by an addition to Miss. App. R. 22, which describes at length the standards and qualifications for

attorneys appointed or retained to represent those under sentence of death in post-conviction

proceedings.

---

[1]These statutes were revised in 2005 as part of Congress's re-enactment of the Patriot Act. The current law provides that the Attorney General of the United States shall adopt opt-in guidelines and shall determine, upon application, whether a state has complied with them.

The first director of the Post Conviction Office was C. Jackson Williams, who was hired effective September 1, 2000.  He has given an affidavit that explains the difficulties that he had in running the Office during its early months.  According to Williams, the Office did not become operational until November, 2000.  In that month, the Mississippi Supreme Court assigned it eleven cases.  In December, 2000, another three cases were added, and, by February, 2001, the Office had been assigned seventeen cases to review, investigate, and brief.  By that point, Williams had hired the two additional attorneys authorized by statute, Terri Marroquin and David Voisin.

Because he thought that the existing workload could not be effectively handled in the Office, Williams began contracting with private attorneys to file petitions for post-conviction relief in some cases, which he was authorized to do by statute.  However, the special fund through which these attorneys were to be paid was never funded by the Mississippi Legislature.  Additionally, the Chief Justice of the Mississippi Supreme Court discouraged Williams from hiring attorneys from outside the state, even though there were few attorneys within the state who were qualified to practice in this area of law.  Some private attorneys who had contracted to handle these cases withdrew after they learned that they would not be paid; some agreed to stay on *pro bono*.

Finally, the State began to oppose the appointment of private counsel in some cases, claiming that they were unqualified to handle death penalty cases.  This opposition, which was based on its desire to qualify for the "opt-in" provision of 28 U.S.C. § 2261, resulted in the removal of Rob Mink, Camille Evans, and Keith Ball from three death penalty cases.  However, it appears that the State's opposition was selective, as in another case where qualified counsel were removed and an unqualified lawyer appointed by the trial court, there was no opposition by the State.

Williams consulted with national death penalty lawyers, who told him that 800-1000 attorney hours should be spent on each case; he estimated that the attorneys in his Office could work no more than 264 hours per petition.  While these figures appear excessive, there is no doubt that the Office was operating with a substantial workload and that the State of Mississippi's involvement in removing private counsel from cases added to the work required from the Office.  Additionally, the amended Miss. R. App. P. 22 (c)(6) stated that post-conviction petitions had to be filed within 180 days after counsel was appointed.  Although the court granted extensions in some cases, it denied relief in others.  (Ultimately, however, the court ruled that this provision was merely a "presumptive timetable" that did not amount to a limitations period.)  Williams informed the court in October, 2001, that the Office could not accept any more cases.  In December, 2001, the court issued a show cause order to Williams, and, on December 31, 2001, Williams resigned as Director of the Office of Post-Conviction Counsel.

Williams was succeeded by Robert Ryan, who retired earlier this year and was succeeded by Glenn Swartzfager, the current Director.  At the time that Williams left, the Office had twenty-seven capital cases assigned to it; the Office assumed responsibility for all but three of the cases, although Camille Evans continued to provide unofficial assistance in the *Wilcher* case.  Of those cases, eleven required that an initial petition be filed, while eight more required additional briefing or supplemental petitions.  In another five cases, inmates had filed skeletal petitions that the Office needed to supplement.

As stated earlier, at the same time that it created the Office, the Legislature shortened the limitations period for death penalty cases from three years to one year.  Initially, attorneys in the Office calculated time pursuant to the ruling of *Booker v. State*, 699 So. 2d 132 (Miss. 1997), which

held that the limitations period began on the date that the United States Supreme Court denied certiorari. However, in December, 2002, the Mississippi Supreme Court held that *Booker*, a plurality opinion, was not binding, and that the statute would begin to run on the date that its mandate was issued, substantially shortening the limitations period in the cases assigned to the Office. *Puckett v. State*, 834 So. 2d 676, 678 (Miss. 2002).

The Office was appointed to Stevens's case on September 28, 2001, just a few months before Williams resigned. Robert Ryan was appointed as the Director of the Office in January, 2002, and Voisin left the Office at about the same time, although he continued to work on some cases. According to Voisin's affidavit, no work had been done on Stevens's case by the time he left. Marroquin left in January, 2003, and Ryan was the sole attorney in the Office until mid-February. On February 20, 2003, Ryan filed Stevens's post-conviction petition; he was permitted to file a supplemental petition on May 5, 2003.

Clearly, there was a period during which the Office was understaffed, underfunded, and overloaded with cases, and this situation was aggravated by the State's interference in some petitioners' representation. The State interfered, seemingly, only for the purpose of satisfying the opt-in statute, which would accelerate the judicial process to the inmates' detriment. However, Stevens's case was not assigned to the Office until late in that period, and, by the time his petition for post-conviction relief was filed, the workload had lessened and new attorneys had been hired. Additionally, Stevens was permitted to supplement his original post-conviction petition.

The law is clear that there is no constitutional right to counsel beyond the direct appeal. *Pennsylvania v. Finley*, 481 U.S. 551, 555 (1987) ("Our cases establish that the right to appointed counsel extends to the first appeal of right, and no further."). That rule applies equally to death

penalty cases. *Murray v. Giarratano*, 492 U.S. 1, 10 (1989). Thus, because there is no constitutional right to counsel in post-conviction proceedings, there is generally no concomitant right that post-conviction counsel be effective. *Coleman v. Thompson*, 501 U. S. 722, 755-56 (1991); *Ruiz v. Quarterman*, 504 F.3d 523, 531 (5th Cir. 2007); *Sheffield v. State*, 881 So. 2d 249, 255 (Miss. App. 2004). Stevens's claim is a little different, in that he alleges that the problems in the Office of Post-Conviction Counsel deprived him of the right to seek post-conviction relief and denied him due process.

Capital habeas litigants in other states have tried to argue that their state's system of appointing post-conviction counsel failed to provide them due process protection, thus excusing procedural defaults committed when that counsel did not raise viable issues in state courts. That argument appears to have been foreclosed by the Supreme Court's opinion in *Finley*, where it held, "States have no obligation to provide this [post-conviction] avenue of relief, and when they do, the fundamental fairness mandated by the Due Process Clause does not require that the State supply a lawyer as well." 481 U.S. at 557. The Ninth Circuit has specifically held that a petitioner cannot avoid prior decisions that there is no entitlement to effective assistance of post-conviction counsel by couching his claim as a due process, rather than a Sixth Amendment, violation. *Moran v. McDaniel*, 80 F.3d 1261, 1271 (9th Cir. 1996). The Eighth Circuit has reached the same conclusion. *Simpson v. Norris*, 490 F.3d 1029, 1034 (8th Cir. 2007).

The Fifth Circuit has written extensively on this issue in the context of Texas law, and it has held on several occasions that ineffectiveness of post-conviction counsel cannot be the grounds for habeas relief. *Martinez v. Johnson*, 255 F.3d 229, 241 (5th Cir. 2001). This is so even if the claims that were defaulted were necessarily raised for the first time during the post-conviction process. *Id.*;

78

*see also Henderson v. Cockrell*, 333 F.3d 592, 606 (5th Cir. 2003).   The result has been the same when the claim has been made as a due process violation. *Matchett v. Dretke*, 380 F.3d 844, 849 (5th Cir. 2004); *Ogan v. Cockrell*, 297 F. 3d 349, 357 (5th Cir. 2002).   The court has similarly rejected arguments that the State's post-conviction review system suffered from such a structural deficiency that it was "absent" or "ineffective to protect his rights." *Ruiz v. Quarterman*, 460 F.3d 638, 644 (5th Cir. 2006).   Ruiz argued that the state had obstructed his efforts to earlier exhaust his claims by providing him incompetent counsel, "effectively making his state remedy illusory . . . ." *Id*. However, the court denied relief, holding, "[T]he law of this Court is clear, ineffective state habeas counsel does not excuse failure to raise claims in state habeas proceedings.   Where the state has provided a habeas remedy, the petitioner must pursue it before filing in federal court, even if the state provides ineffective habeas counsel." *Id*.   In its later opinion on this case, the Fifth Circuit granted relief based on Fed. R. Civ. P. 60(b). *Ruiz v. Quarterman*, 504 F.3d 523 (5th Cir. 2007).   Relief was not granted on grounds that the prior opinion was in error; in fact, the court referred to its earlier opinion on the issue of ineffectiveness of post-conviction counsel.   Instead, the court granted relief on grounds that, after the first opinion was issued, the state court ruled on the merits, thereby eliminating the issue of exhaustion.   504 F.3d at 531.

In the context of Mississippi law, Stevens contends that the issue is more complex, since he is not arguing that a single attorney was ineffective, but that the entire process has suffered from systemic problems generated by the State.   Additionally, he asserts that the Mississippi Supreme Court recognized post-conviction proceedings as part of the appellate process in death penalty cases in *Jackson.* However, since that decision, the Mississippi Supreme Court has twice spoken on the issue of whether a litigant is entitled to effective assistance of counsel at the post-conviction stage,

and, on both occasions, the court has held that there is no such entitlement.  In *Wiley v. State*, 842 So. 2d 1280 (Miss. 2003), the prisoner sought the appointment of an attorney not employed by the Office of Capital Post-Conviction Counsel, who had been serving *pro bono*.  The court held that its previous holding in *Jackson* "does not specifically establish a constitutional right to compensated counsel," nor did it create a liberty interest in post-conviction counsel.  *Id*. at 1285.   In *Brown v. State*, 948 So. 2d 405 (Miss. 2006), the prisoner had not alleged ineffectiveness of trial counsel on appeal, but attempted to raise it as grounds for post-conviction relief.  He argued that *Jackson* had set "new legal standards" that included a fundamental right to effective post-conviction review, including the right to challenge procedural bars and receive effective assistance of counsel.  The court denied relief on both claims.  *Id*. at 413.  These holdings limit *Jackson*'s language to requiring the appointment of *competent* counsel to represent litigants in post-conviction proceedings, as a matter of state law.  Mississippi does not extend that language it to requiring *effective* counsel at that stage, nor does *Jackson* confer a constitutional right to post-conviction counsel.

More importantly, for this Court's purposes, the Fifth Circuit has recently rejected this argument in a case from Mississippi.  *Bishop v. Epps*, 265 F. App'x 285 (5th Cir. 2008).  Bishop's case had been assigned to the Post-Conviction Office in March, 2002, and his post-conviction petition was filed in April, 2003.  At the time that his petition was filed, Bishop asked for an extension of time to supplement the pleading, which was denied.  These facts were argued to the District Court for the Northern District of Mississippi as supporting Bishop's claim that there was an absence of available state corrective process to protect his rights, thereby excusing his failure to exhaust certain issues.  The district court summarized Bishop's claims as follows:

> Petitioner's argument is that, due to the actions of the [state supreme] court in denying him additional time, any potential procedural defaults that might here be imposed against his claims should be excused due to his inability to raise such claims at the State court level.  Petitioner asserts the heavy workload of the Office [of Post-Conviction Counsel], combined with the lack of qualifications of post-conviction counsel, denied him any possible redress to his constitutional violations.

*Bishop v. Epps*, No. 1:04CV319MPM, 2007 WL 2363465 at *6 (N.D. Miss. Aug. 16, 2007).

Additionally, Bishop argued that his post-conviction counsel was ineffective. *Id*. at *20.  The district

court denied habeas relief on both grounds.  On appeal, the claim was characterized as an

ineffectiveness claim, and the Fifth Circuit also refused to acknowledge it.  *Bishop*, 265 F. App'x

at 289-90, citing *Finley*, 481 U.S. at 555.

The case came before the Fifth Circuit again a few months later, in the form of a motion for

relief under Fed. R. Civ. P. 60 and a request for an emergency stay of execution.  *Bishop v. Epps*, No.

08-70029, 2008 WL 2831273 (5th Cir. July 22, 2008).  Bishop claimed that, rather than having an

attorney representing him in his post-conviction proceedings, he "had an attorney actively working

to subvert his case and ensure that he had no chance of success."

The Fifth Circuit did not stay Bishop's execution, characterizing his pleading as a successive

habeas petition rather than a Rule 60 motion.  Moreover, despite his allegations against Ryan, the

Fifth Circuit adhered to its original ruling that ineffectiveness of post-conviction counsel cannot be

grounds for habeas relief, citing both 28 U.S.C. §2254(I) and *Matchett*.  The court ended its opinion

by stating, "Our decision is final and resolves the issue entirely."  2008 WL 2831273 at *4.  That

opinion, while unpublished and not binding,[2] provides persuasive authority to guide this Court's

decision on virtually the same argument.

---

[2]5th Cir. R. 47.5.4.

Although the history of the Office of Post-Conviction Counsel presents troubling questions, Stevens's argument suffers from two significant weaknesses.  First, the Mississippi Supreme Court has expressly disclaimed that its prior opinion in *Jackson* intended to establish a right to anything but a competent attorney for that process.  Second, it fails to recognize that the State of Mississippi was not constitutionally obligated even to provide post-conviction review, as the Fifth Circuit has unequivocally declared.  Additionally, it is not clear that Stevens suffered any individual prejudice from the problems in that Office, since both a petition, and a supplemental petition were filed on his behalf.  Stevens is not entitled to relief on this issue.

In conclusion, the Court has carefully reviewed the record in this case and each ground for habeas relief asserted by Benny Joe Stevens.  It has found no part of the Mississippi Supreme Court's opinion to be an unreasonable application of clearly established federal law.  For this reason, Benny Joe Stevens is not entitled to habeas relief under 28 U.S.C. § 2254.

IT IS, THEREFORE, ORDERED that Benny Joe Stevens's Petition for Writ of Habeas Corpus under 28 U.S.C. § 2254 is **denied**.

IT IS FURTHER ORDERED that this action is **dismissed with prejudice**.  A separate final judgment dismissing this action with prejudice shall be entered in accordance with Fed. R. Civ. P. 58.

IT IS SO ORDERED, this the 15th day of September, 2008.

*s/Keith Starrett*
UNITED STATES DISTRICT JUDGE